**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **PULSE NETWORK LLC** | § | |
| | § | |
| **PLAINTIFF,** | § | |
| | § | **CIVIL ACTION NO. _____** |
| **v.** | § | |
| | § | **(JURY DEMANDED)** |
| **VISA INC.** | § | |
| **DEFENDANT.** | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

Plaintiff, PULSE Network LLC ("PULSE"), files Plaintiff's Original Complaint against defendant, Visa Inc. ("Visa"), and for same would respectfully show the Court as follows:

**NATURE OF ACTION**

1.      Visa is a longtime monopolist in the general purpose debit card network services market in the United States.  In order to maintain its monopoly, Visa has undertaken a series of illegal actions that undermine competition – harming rival debit networks, merchants, acquirers, card issuers, and consumers.  This complaint by PULSE seeks to enjoin Visa's ongoing violations of antitrust laws, receive compensation for lost profits, and promote healthy competition for general purpose debit card network services in the United States.

**PARTIES**

2.      Plaintiff, PULSE, is a limited liability company organized and existing under the laws of Delaware with its principal place of business since July 1981 in Houston, Texas.  Among other things, PULSE offers general purpose debit card network services ("debit network

services") to acquirers, processors, financial institutions, and merchants, with the majority of its current business consisting of offering PIN debit network services. PULSE is a subsidiary of Discover Financial Services (NYSE: DFS), a direct banking and payment services company with one of the most recognized brands in U.S. financial services today. PULSE serves thousands of financial institutions by enabling their debit cardholders to make purchases throughout the United States, access cash across North America and pay bills online, all using their debit card. PULSE also provides Discover and Diners Club cardholders access to its global automated teller machine ("ATM") network consisting of more than 1.3 million locations. In the four quarters ending June 30, 2014, PULSE processed 4.2 billion transactions with a total dollar volume of approximately $163 billion.

3.     Defendant, Visa, is a Delaware corporation with its principal place of business in Foster City, California. Visa is a global organization with a presence in more than 200 countries and territories and nearly 10,000 employees around the world. Visa offers credit card and debit card network services to issuing financial institutions, acquiring financial institutions, and merchants. In the four quarters ending June 30, 2014, its global network processed 93.9 billion transactions with a total dollar volume of approximately $7.2 trillion.

**JURISDICTION AND VENUE**

4.     This complaint is filed under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and for damages under Section 4 of the Clayton Act, 15 U.S.C. § 15. This Court has jurisdiction over the federal antitrust law claims alleged herein under 28 U.S.C. §§ 1331 and 1337. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367 because those claims share a common nucleus of operative facts with the federal

claims and are therefore so related to the federal claims that they form part of the same case or controversy.

5.    Venue is proper in the Southern District of Texas under 28 U.S.C. § 1391 and 15 U.S.C. §§ 15 and 22.  Visa transacts business and is found in this district.  The interstate trade and commerce involved and affected by the alleged violations of law was and is caused in part in this district.  The acts complained of have had, and will have, substantial anticompetitive effects in this district.

**SUMMARY OF LAWSUIT**

6.    In the United States, there are two different types of debit card networks that are commonly used – "PIN" debit and "signature" debit.  With PIN debit, a cardholder typically inputs a Personal Identification Number or "PIN" into an electronic terminal at the point of sale to authenticate purchase transactions.  With signature debit, cardholders typically authenticate transactions by affixing their signature.  While PIN debit and signature debit are two different types of networks in the United States, PIN debit and signature debit network functionality reside on the same debit cards issued by financial institutions to cardholders.

7.    In countries outside of the United States, signature debit networks have been deemphasized.  The reason is that fraud rates are substantially higher for signature debit than for PIN debit, largely because PIN authentication is more secure than a signature.

8.    Despite the significant advantages of PIN debit, most debit card usage in the United States is still based on signature debit.  The reason is Visa.  Visa dominates the provision of signature debit network services, maintaining a market position based on charging higher fees for its services and earning higher profits.  Permitting the superior PIN debit to predominate in the marketplace would cost Visa a lot of money.  Accordingly, Visa has a long history of making

3

sure that does not happen, including undertaking illegal behavior to fend off competitive threats to its debit network services monopoly.

9.      Visa acquired its debit network services monopoly during the 1990s by requiring merchants that accepted Visa credit cards also to accept Visa signature debit cards.  Because few merchants were willing to drop credit card acceptance, imposing this tying arrangement meant that Visa could assure itself of broad merchant acceptance for its signature debit network.  It also meant that whenever a cardholder chose signature debit authentication, a merchant would have to pay the fees Visa dictated.  Visa used this power over merchants to put in place a pricing structure in which merchants paid high fees to financial institutions that issued Visa signature debit cards, which in turn created strong incentives for issuers to focus on incentivizing use of Visa signature debit by cardholders.  Visa's tying arrangement was challenged by merchants in an antitrust lawsuit that Visa eventually settled by paying billions of dollars.  *In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568 (E.D.N.Y. 2003).

10.     Around the same time that Visa was illegally ensuring that signature debit would become predominant in the United States, Visa imposed a rule prohibiting any of its issuing financial institutions from also issuing signature debit cards on competitor networks such as Discover.  The rule ensured that Visa would dominate the large signature debit marketplace that it had illegally created.  The Department of Justice challenged that Visa rule and it was found to violate the antitrust laws by a federal district court in New York City and the 2nd Circuit.  *United States v. Visa and MasterCard*, 344 F.3d 229 (2d Cir. 2003).

11.     By 2004, the illegal practices that Visa had used to acquire its debit network monopoly had been struck down and eliminated.  But by then it was too late.  Over 70% of debit

cards in the United States bore the Visa brand and nothing in the resolution of the prior antitrust cases changed that. Visa's debit network pricing reflected its resulting dominant position.

12.     Visa also had already moved to take the next step in protecting and strengthening its debit network services monopoly as the prior antitrust litigation was winding up. Beginning in the early 2000s, Visa negotiated agreements with numerous Visa debit card issuing financial institutions that resulted in Visa's affiliated PIN debit network, Interlink, obtaining sole placement as a PIN debit network on a substantial number of Visa signature debit cards. While Visa had no interest in having PIN debit replace signature debit, by gaining control of a greater share of PIN debit transactions, Visa sought to limit competition for signature debit and ensure that debit network pricing remained high. In particular, Visa used its agreements with debit card issuers to neutralize merchant and acquirer attempts to avoid Visa's high signature debit network pricing by switching to PIN debit, the superior product. If both the signature debit and PIN debit options on a debit card were controlled by Visa, then merchants and acquirers would have no choice but to send their debit transactions to a Visa-controlled network. As a result of these agreements, Visa's share of debit network transactions grew further.

13.     Congress noticed. In July 2010, Congress enacted the Durbin Amendment as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act. The Durbin Amendment, along with the regulations issued thereunder, required many changes in how debit networks operate, including requirements that (a) issuing financial institutions include at least two networks unaffiliated with each other on every debit card and (b) merchants have the ability to send their debit card transactions for processing to whichever debit network they prefer. The former meant that Visa could no longer obtain sole placement for Interlink on Visa signature debit cards. The latter meant that merchants could choose based on the merits which network to

use to process a transaction. Overall, as a result of these changes, Visa was squarely confronted with the prospect of enhanced competition from other debit networks.

14. Visa did not welcome this new competition. It stated soon after the regulations under the Durbin Amendment were issued that "[r]egulation has dramatically altered the competitive environment in the United States" and warned investors that it likely would lose debit network volume. Visa Q3 2011 Earnings Call Transcript, p. 2. Indeed, during 2012, Visa reported losing Interlink PIN debit network volume on a year-over-year basis.

15. Visa could have confronted this new challenge with competition on the merits. Even though issuers of Visa signature debit cards were now effectively required to place at least one non-Visa PIN network option on their cards, Visa could have tried on the merits to convince those issuers to include Visa's PIN network as well. In addition, even though merchants and acquirers now had an option to process debit card transactions on a non-Visa network, Visa remained free to compete on price, quality, and service to convince those merchants and acquirers to route through Visa on the merits. But Visa chose not to compete on the merits. Instead, Visa chose to tilt the competitive playing field to its advantage. Specifically, Visa adopted a carefully integrated, illegal strategy to preserve and enhance its debit network services monopoly.

16. Instead of trying on the merits to convince Visa's signature debit card issuers to include Visa's PIN network as one of the options on their cards, Visa imposed a new mandate on its issuing financial institutions called the PIN-Authenticated Visa Debit mandate (or "PAVD mandate") that *requires* issuers of Visa signature debit cards to include Visa's PIN authentication functionality on their cards. So while every other PIN debit network must *compete* to have issuers place their PIN network on Visa signature debit cards, Visa has avoided such competition

by *mandating* that a Visa PIN option be included on every Visa signature debit card. Visa is enforcing this mandate through threats, fines, and penalties. The PAVD mandate injures card issuers and cardholders and, by itself and together with other illegal Visa actions, serves to exclude rival PIN debit networks, harm competition, and protect Visa's monopoly.

17. Visa's anticompetitive post-Durbin Amendment actions do not stop there. In addition to forcing its own PIN authentication functionality onto all Visa signature debit cards, Visa also used its market power to alter the economics for merchants and acquirers when they choose a network on which to process their debit card transactions. In response to the Durbin regulations, Visa imposed a fixed network fee (called the Fixed Acquirer Network Fee, or "FANF") that is triggered whenever a merchant accepts Visa credit or debit cards. If a merchant (through its acquirer) refuses to pay this onerous fee, it no longer is permitted to accept any Visa cards. Yet, dropping acceptance of Visa credit cards is not a practical option for the vast majority of merchants. *See, e.g., United States v. Visa, Inc.*, 163 F.Supp.2d 322, 340 (S.D.N.Y. 2001) (merchants "cannot refuse to accept Visa and MasterCard even in the face of significant price increases because the cards are such preferred payment methods that customers would choose not to shop at merchants who do not accept them"). Given the huge number of Visa cards held by consumers and Visa's consequent "must have" status, merchants have no realistic choice other than to pay the FANF.

18. Visa has implemented the FANF as part of an integrated strategy to tilt post-Durbin debit network competition in its favor. Under this new integrated strategy, Visa raises overall debit network fees for merchants and acquirers, while including lower per-transaction fees as part of its new price structure. As part of this strategy, Visa started reaching out to high-volume and debit-intensive merchants and acquirers to offer them a new "deal": a partial offset

to the substantial price increase from the FANF in return for their sending their signature and PIN debit card transaction volume over Visa's debit networks. Consequently, in choosing a debit network, merchants and acquirers began to consider not only the relative merits of the different networks in terms of price, quality, and service, but also Visa's offer to reduce their FANF burden in return for business.

19. Rival PIN debit networks lack the market power to match Visa's scheme. And even though the scheme overall is a price increase for merchants and acquirers, the scheme excludes rival debit networks from undercutting the price increase. That is because the FANF is not a per-transaction fee, but a fee charged for having access to Visa's network for credit or debit transactions. The only way a rival network could make an offer that would allow a merchant to avoid the price increase would be to persuade a merchant to drop Visa. No matter what offer another debit network might make, few, if any, merchants would be willing to drop Visa entirely to avoid the FANF. The net effect of this integrated FANF scheme therefore is reduced competition, higher debit network fees imposed on merchants and acquirers, and harm to consumers.

20. A main goal of Visa's illegal post-Durbin scheme is protecting its signature debit business, the crux of its debit network monopoly and the part of its business on which it earns the majority of its debit network profits. By denying smaller rival PIN debit networks greater share, Visa seeks to preclude these networks from challenging Visa's dominant position as a signature debit network and to maintain higher pricing. Beyond the PAVD mandate and the FANF pricing structure, Visa has taken other steps to preclude competition against its signature debit network business. For example, as part of its new "deal" with merchants and acquirers, Visa requires them to meet volume targets designed to impede rival PIN debit networks from obtaining the

needed critical mass of volume to compete more effectively for transactions historically processed over Visa's signature debit network. These agreements have particular force today because, beyond the threat of the Durbin regulations to its business, Visa faces the prospect of new product development by PIN debit networks designed to compete for debit transactions historically processed over signature debit networks. Visa also is structuring and enforcing its agreements with issuers in ways to impede PULSE and other PIN debit networks in their efforts to develop new products to compete with Visa's signature debit business. The net effect is that Visa is thwarting nascent competition that would otherwise result in lower network costs for merchants, acquirers, issuers, and ultimately consumers.

21.     Visa's illegal strategy has already had substantial effects. After an initial loss in debit volume, Visa's strategy has been so successful that, in its own words, "U.S. debit is re-emerging as a driver of growth." Visa Investor Day, p. 24 (June 6, 2013). Compared to how the marketplace would have – and should have – evolved post-Durbin, Visa's actions have resulted in higher profits for Visa, higher prices charged to merchants, acquirers, and issuers, higher prices for consumers, and less debit network volume and reduced competitive viability for rival PIN debit networks, including PULSE. In addition, as a direct result of its new debit strategy, Visa has acquired an unfettered ability to marginalize or eliminate competition from rival PIN debit networks. Visa's anticompetitive conduct has already directly injured PULSE and, if unchecked, will continue to injure PULSE in a substantial manner.

**FACTUAL BACKGROUND**

**Payment Cards**

22.     The two most common types of payment cards used in the United States are general purpose credit and charge cards ("credit and charge cards") and general purpose debit cards ("debit cards").

23.     General purpose credit and charge cards allow a cardholder to make purchases from multiple, unaffiliated merchants without immediately accessing funds in a checking or savings account.  A general purpose credit card gives cardholders the option of paying all charges within a defined period, or only a portion within the set period and the remainder in installments with interest.  A general purpose charge card requires the cardholder to pay all charges within a defined period.

24.     General purpose debit cards also allow a cardholder to make purchases from multiple, unaffiliated merchants.  Unlike a credit or charge card, however, payment is deducted from the cardholder's deposit account at or near the time of the purchase of goods or services from a merchant.

**Debit Networks and Transactions**

25.     When a cardholder "swipes" a debit card at a merchant terminal, it starts a process that permits the merchant to receive approval for the cardholder to make a purchase and to receive a transfer of money from the cardholder's deposit account.  In basic terms, the process involves authorization, clearance, and settlement.  The first step is authorization.  The request to purchase a product for a certain price is transmitted to the financial institution that holds the cardholder's deposit account to confirm that the cardholder has the required amount in the account and that it is otherwise a valid transaction.  If no problems are identified, the transaction

is "authorized," *i.e.*, approved. The next step is clearing and settlement. The merchant (and its merchant acquirer) will exchange transaction-related information ("clearing") with the network so as to determine a "settlement" amount, resulting in a transfer of funds from the cardholder's bank account to the merchant's bank account.

26. Debit networks are intermediaries that provide network services to facilitate the processing of debit card transactions. Debit networks provide infrastructure and rules that enable the processing of debit transactions. The networks sell their services to other market participants. Typically their direct customers are issuers and merchant acquirers (described below). Debit networks also negotiate pricing directly with some large merchants.

27. In the United States, two different types of networks have arisen over the past three decades to provide network services for debit card transactions: signature debit networks and PIN debit networks.

28. Signature debit networks evolved using the physical infrastructure of the credit card networks. A signature debit transaction, like a credit card transaction, is typically authenticated by the cardholder's signature. Sometimes the cardholder is not physically present and in those cases, such as Internet-based, telephone, or mail order transactions, authentication typically occurs using other methods. Signature debit transactions, also like a credit card transaction, generally use two separate messages for authorization, clearing, and settlement (sometimes called "dual messaging"). In one message, authorization is sought for the transaction. In a second message, a "batch" of transactions that have occurred over a period of time are collected together by the merchant and its acquirer and presented for clearance and settlement through the debit network.

29.     The vast majority of debit cards in circulation in the United States today include a signature debit network (*i.e.*, Visa or MasterCard branded on the front of the card). Signature debit networks are identifiable not only by the branding typically on the front of the card, but also by the Bank Identification Number ("BIN"). A financial institution will be assigned a BIN (the first six digits on the front of the card) and the identity of the signature debit network will be reflected in the first digit or two ("4" for Visa, "51" through "55" for MasterCard, etc.) of the 16-digit primary account number ("PAN") displayed on its debit cards. Because the signature debit network is "hard coded" in this way onto a debit card, a decision by a signature debit card issuer to switch signature debit networks requires reissuing debit cards. Together, either Visa or MasterCard is the signature debit network included on over 99 percent of all debit cards, with Visa the dominant network between the two.

30.     Unlike signature debit networks that evolved on the infrastructure of credit card networks, PIN debit networks evolved using the physical infrastructure of the original ATM networks (also sometimes called electronic funds transfer networks or EFT networks). In a PIN debit transaction, like an ATM transaction, the cardholder typically enters a PIN number that allows the issuer to verify and authenticate a transaction electronically. Also like an ATM transaction, PIN debit networks generally today use a single message for authorization, clearing, and settlement (sometimes called "single messaging"). As a result, in contrast to signature debit with dual messaging, the amount that will be withdrawn from the cardholder's checking account in a PIN debit transaction is posted almost immediately, much like an ATM withdrawal. There were originally dozens of ATM networks (and thus PIN debit networks) and, even though consolidation has occurred, there are still today numerous PIN debit networks, including PULSE,

STAR, NYCE, ACCEL, Shazam, Jeanie, Credit Union 24, and AFFN. Visa and MasterCard each own their own PIN debit network in the United States, Interlink and Maestro respectively.

31.     Over the last couple of decades, the vast majority of debit cards have been issued not only with a signature debit network (on the front of the card, as described above) but also have included the capability for debit transactions to be processed by at least one PIN debit network (sometimes, but not necessarily, identified on the back of the card). An individual debit card thus generally can support both signature-based and PIN-based transactions at the point-of-sale.

32.     In some cases today, for small dollar transactions, debit networks support point-of-sale transactions without any cardholder authentication, *i.e.*, no signature or PIN is required. Signature debit networks predominate with such transactions, but PIN debit networks are coming to market with products, if not undermined by Visa's illegal debit strategy, that will offer greater competition for processing these debit transactions.

33.     Merchants, issuers, and cardholders have identified significant drawbacks to signature-authenticated debit transactions relative to PIN-authenticated debit transactions. Signature debit is a relatively poor verification method for preventing fraud. Because PIN debit requires cardholders to enter PIN numbers to initiate transactions, thieves find it much more difficult to use PIN functionality to commit fraud. The fraud rates associated with signature debit transactions are significantly higher than fraud rates for PIN debit transactions. The Federal Reserve reports that the "percentage of signature transactions that were fraudulent were more than seven times that of PIN transactions in 2011." Board of Governors of the Federal Reserve System, "2011 Interchange Fee Revenue, Covered Issuer Costs, and Covered Issuer and Merchant Fraud Losses Related to Debit Card Transactions," 25 and Table 10 (March 5, 2013)

("2011 Federal Reserve Reg. II Study").  Dual messaged signature debit transactions are also more costly than single messaged PIN debit transactions.

34.     Debit networks compete separately on both sides of what are sometimes called "two-sided platforms" or "two-sided markets," meaning networks need to attract both merchants and issuers to make the network attractive to all parties.  Issuers are important, not only because networks want to maximize network usage by having as many cards in circulation using the network as possible, but also because a merchant's decision to accept the network is partially a function of how many cards are circulating that can be processed over that network.  Reciprocally, merchant acceptance is important, not only because maximizing network usage requires that cardholders have the ability to use their cards at as many different points of sale as possible, but also because issuers prefer networks with wider merchant acceptance.

**Debit Network Participants**

35.     A debit card transaction will typically involve not only the debit network, but at least four other parties: the cardholder, the financial institution that issues the debit cards ("issuer"), the merchant, and the merchant's acquirer.  Both signature debit and PIN debit networks are intermediaries that facilitate the interactions among these parties.

36.     Cardholders.  A cardholder is the person to whom the debit card is issued by a financial institution and who will use the debit card to purchase goods or services at merchants.  The cardholder will have a banking relationship with the issuer and the debit card will be used to access the cardholder's deposit account to pay for a product or service from a merchant.

37.     Issuers.  Debit card issuers are the financial institutions that distribute debit cards to cardholders.  The vast majority of issuers are retail financial institutions providing deposit

account holders with debit cards. Issuers also provide customer service to cardholders and determine which networks will be enabled on the debit cards they issue.

38. <u>Merchants</u>. Merchants are retail or other business establishments at which cardholders can purchase products or services with debit cards. Merchants choose which debit network's cards to accept. Many merchants accept signature debit cards but have not installed the equipment necessary to accept PIN debit transactions, because of lack of space, because use of PIN pads is inconsistent with the business model (*e.g.*, it is usually impractical for a restaurant where tipping occurs to have a customer key in a PIN number to authorize a transaction), or for other reasons. Virtually all of the largest point-of-sale merchants in the United States accept both PIN and signature debit transactions.

39. <u>Merchant Acquirers</u>. Merchant acquirers operate as intermediaries between debit networks and merchants. A primary function of the merchant acquirer is to sponsor a merchant for a network by underwriting the risk the merchant poses to the network and issuers (*e.g.*, fraud or inability to repay chargebacks on purchases for which an issuer has already forwarded funds through the network to the merchant). Reflecting this risk underwriting function, some of the largest merchant acquirers are affiliated with the same financial institutions that also issue debit cards. A typical merchant will have an acquiring relationship with one acquirer to handle its payment network needs. Acquirers, in turn, enter into agreements with debit networks providing for their ability to sponsor merchants to accept debit transactions over such networks.

40. Beyond risk underwriting and providing an interface with the network, merchant acquirers can also be involved in the processing of transactions for merchants. Merchant processing activities include routing authorization requests from the merchant to the network (and on to the issuer), relaying the issuer's reply back to the merchant, handling electronic and

paper receipts for the merchant, and settling transactions. After a merchant has agreed to accept debit cards, the merchant processor also arranges (possibly through a subcontractor) for the installation of compatible point of sale terminals, maintains and repairs the terminals, and trains the merchant's employees on how to use the terminals.

41.     A myriad of contractual relationships exist between entities involved in merchant acquiring and merchant processing, and different debit networks impose different rules regarding the relationship between merchant acquiring and merchant processing. A merchant acquirer may itself provide the merchant processing. Networks and merchants also may enter into contractual relationships directly with merchant processors, in which case the merchant acquirer may primarily provide only a risk underwriting function. In this Complaint, the terms "merchant acquirer" or "acquirer" will be used as shorthand for the companies providing underwriting and merchant processing services as intermediaries between merchants and debit networks.

**Debit Network Pricing**

42.     Debit networks charge various fees. Generally speaking, these fees can be divided between interchange fees and network fees.

43.     Interchange Fees. An interchange fee is a per-transaction fee paid by a merchant acquirer directly (and the merchant indirectly) through the network to the financial institution that issued the debit card used in a transaction. Interchange fees account for a high percentage of the costs of a debit network transaction from a merchant perspective. While debit networks determine the level of interchange fees, such fees primarily operate as a pass-through from the network perspective, with acquirers (and merchants indirectly) effectively paying the interchange fees to issuers. Thus, debit networks typically do not earn revenues from interchange fees. Rather, the debit network profits from usage of the network through charging network fees.

44.     Interchange fees can be set at "negative" levels that involve per-transaction payments from issuers to merchants instead of vice versa (sometimes called reverse interchange). ATM network transactions have that structure and the early days of PIN debit networks involved negative or low interchange rates, reflecting the networks' origins as ATM networks. Debit network interchange rates today, however, are "positive" (involving payments from merchants and their acquirers to issuers) and have been heavily influenced by Visa's conduct over time, including Visa's illegal conduct. Historically, signature debit interchange fees have been substantially higher than PIN debit interchange fees, although the difference had narrowed over time pre-Durbin.

45.     As discussed below, debit network interchange fees for large issuers are now subject to caps under the Durbin Amendment and regulations. Reflecting the impact of the Durbin Amendment and regulations, debit interchange fees have fallen since 2011. Board of Governors of the Federal Reserve System, "2013 Interchange Fee Revenue, Covered Issuer Costs, and Covered Issuer and Merchant Fraud Losses Related to Debit Card Transactions," Exhibit 8 (September 18, 2014) ("2013 Federal Reserve Reg. II Study"). The effects of the Durbin Amendment in lowering interchange fees are independent of Visa's illegal conduct and Visa's illegal conduct should be assessed against a baseline in which these effects already occur.

46.     <u>Network Fees</u>. Network fees are the fees charged by debit networks to their customers on both the merchant and issuing sides of their business. In most cases, network fees are reflected in a network's contracts with acquirers and issuers, although in some cases networks will negotiate network fees directly with a merchant. While interchange fees from a network perspective generally operate as a pass-through from merchant to acquirer to issuer, network fees constitute revenues for a debit network and are how they primarily earn profits.

The most important network fees historically are the fees charged per-transaction for processing a transaction. For Visa, the FANF also is now a major part of the revenues it earns from its debit network business.

47.     A debit network will set separate network fee schedules for acquirers and issuers, and those network fee schedules constitute separate revenue streams for a network. Unlike interchange fees, where the fee generally is a pass-through and changes in interchange directly affect both acquirers (and derivatively merchants) and issuers, a network can change network fees on one side of its business without changing network fees on the other side, *e.g.*, a network could raise network fees on merchants and acquirers without raising network fees on issuers. As a result, a debit network such as Visa can exercise market power by raising network fees for merchants and acquirers alone, by raising network fees for issuers alone, or both.

48.     Network fees for signature debit networks are much higher than for PIN debit networks, reflecting the lessened competition that exists today among signature debit networks. That is true on both the merchant and issuing sides of the business. Acquirers and merchants thus pay higher network fees on average to have debit transactions processed by signature debit networks than by PIN debit networks. Issuers also pay higher network fees on average to have debit transactions processed by signature debit networks than by PIN debit networks.

49.     <u>Pricing Between Merchant Acquirers and Merchants</u>. While some merchants also negotiate directly with networks, the price, or fees, paid by a merchant for debit network transactions generally reflects its agreement with its merchant acquirer. There are a wide variety of pricing constructs in agreements between acquirers and merchants. A traditional model involves merchants paying acquirers by having a percentage discount, also known as the merchant discount, applied to the funds transferred from the issuer (*e.g.*, if the merchant sold

goods for a $100 and the merchant discount rate is 2%, the merchant would receive $98 and the acquirer would retain $2). The merchant discount rate accounts for the acquirer's own costs, including interchange fees and network fees paid by the acquirer to the debit network, while also adding a markup. The interchange fee accounts for the largest portion of the merchant discount.

50. Rather than have one bundled merchant discount fee, many merchants negotiate pricing with acquirers in which debit network costs are passed through directly with a separate fee added-on to account for an acquirer's costs and profit margin. In such a pricing relationship, any change in debit network fees to a merchant acquirer is directly passed through to merchants.

**Prompting and Routing**

51. Merchants that accept both PIN and signature transactions can influence which debit network processes its transactions through "prompting." Prompting involves actively encouraging a cardholder to choose a particular method of authentication at the point-of-sale. An example of prompting is where merchants (through their acquirers) program PIN pads to ask a cardholder to enter their PIN. For many cardholders, such prompting will have an effect on which type of authentication method the cardholder will choose.

52. Historically, some merchants have engaged in prompting to encourage usage of PIN debit because their costs are lower with PIN debit networks than with signature debit networks. Many large merchants, in particular, have used such prompting and thereby have greatly increased PIN debit usage. For many smaller merchants, the decision whether to prompt is made by their merchant acquirer, but an acquirer often has the same cost-based incentive to prompt for PIN.

53. If PIN authentication is chosen, for many PIN debit card transactions, the merchant (or acquirer when the merchant delegates the decision) must make a "routing"

decision. A routing decision is needed if more than one network is enabled on the card to process PIN debit transactions and the merchant accepts more than one of those networks. Routing consists of choosing which PIN debit network will process a transaction and occurs after PIN authentication has been chosen by a cardholder. A merchant will decide upon some methodology for choosing among available PIN debit networks. These preferences, or "priorities," among PIN debit networks are typically reflected in "routing tables" that are maintained by a merchant's acquirer.

54. Pre-Durbin, debit network operating rules governed how transactions should be routed. Debit network rules traditionally allowed the issuer, or sometimes the debit network itself, to dictate to merchants and acquirers how they should route a debit transaction. While sometimes conflicting network priority rules or the insistence of a large merchant led to merchants and acquirers deciding how to route a debit transaction, merchants and their acquirers usually did not decide over which PIN debit network a transaction was routed.

55. That changed with the Durbin Amendment, which requires debit networks to permit merchants and acquirers to control routing decisions. A merchant or acquirer will typically set up the routing table based on the per-transaction pricing it receives from the different PIN debit networks.

56. For signature-based transactions, historically there has been no routing choice to be made, because few, if any, debit cards have more than one signature debit network included on a card. That lack of choice may change in the future, as PIN debit networks such as PULSE develop their networks to give customers additional choices for processing transactions historically routed over signature debit networks. Such new competition, however, will depend

on the continued competitive viability of these rival PIN debit networks and the absence of anticompetitive behavior by Visa preventing such competition.

## VISA'S HISTORIC ACQUISITION OF A DEBIT CARD NETWORK SERVICES MONOPOLY

57.     During the last 25 years, Visa has acquired and maintained a general purpose debit card network services monopoly.

### Early Growth of PIN Debit

58.     Starting in the 1970s, regional ATM networks were developed, in which deposit-taking financial institutions began to allow their customers to use PIN-authenticated cards and ATMs to withdraw funds from their deposit accounts.  By 1987, there were more than a hundred regional and local ATM networks operating in the United States.

59.     ATM networks eventually evolved to add PIN point-of-sale functionality at merchants.  Many ATM networks, including PULSE, STAR, NYCE, and Accel/Exchange thus also became PIN debit networks.

60.     The PIN debit networks worked with financial institutions to promote the growth of debit in the 1980s and 1990s.  To promote PIN debit, the PIN debit networks and merchant acquirers encouraged merchants to accept PIN debit cards.  In most situations, the PIN debit networks set very low interchange fees, which made acceptance of PIN debit cards attractive for merchants.  During the 1980s and 1990s, it was common for financial institutions to participate in numerous PIN debit networks and for the logos of those networks to be displayed on debit cards.

**Visa's Strategy to Dominate Debit Through Its Signature Debit Product**

61.     By contrast to PIN debit's initial strong growth, prior to the 1990s, Visa and MasterCard's signature debit network products had limited success.  Because a signature-based system introduced risks that were not associated with PIN authentication, financial institutions only issued signature debit cards to their most creditworthy customers.  Given these limitations, by 1990, signature debit cards were viewed as a niche product with, at best, a limited future.

62.     In the early 1990s, Visa recognized that PIN debit was poised to continue to grow. In a June 1990 presentation to the Visa board, Visa's own strategic consultant, Andersen Consulting, predicted the ultimate "demise" of signature debit if PIN debit was "uncontained." Andersen also predicted that, if "uncontained," PIN debit would maintain its low interchange fee structure and thrive by attracting greater merchant acceptance through lower interchange fee pricing.

63.     At that time, the prevailing view was that PIN debit would become the leading debit network product in the United States, as it was elsewhere in the world.  According to another one of Visa's consultants, PIN debit would reach "6 billion transactions annually."  PIN debit was growing at an annual rate of over 40 percent, and Visa recognized that PIN debit was poised to take off with or without Visa's participation.

64.     As a result, Visa launched a strategy intended to push the U.S. debit network marketplace away from PIN debit and toward signature debit.  Visa's strategy involved building brand equity for its signature debit product – Visa Check – and offering issuers signature debit interchange fees (paid by merchants) that were much higher than PIN debit interchange fees and similar to standard credit card interchange fees.  These higher interchange fees made Visa Check a potentially attractive product for issuers.  However, Visa Check was a much less attractive

product for merchants, which faced paying high interchange fees for many transactions in which customers previously paid using lower priced payment mechanisms.

65.     Visa thus needed some way to force merchants to accept a product that was not attractive to them.  It did so by tying merchant acceptance of the signature debit product, Visa Check, to acceptance of Visa credit cards.  Visa used its "Honor All Cards" ("HAC") rules to require merchants that accepted Visa credit cards also to accept Visa signature debit card transactions.  Because few, if any, merchants accepting Visa credit cards could afford to drop such acceptance, Visa was able to force merchants to accept a less desirable product.  The HAC rules ensured that merchants accepted signature debit transactions at credit card-like interchange rates.  As such, Visa "solved" the "chicken and egg" problem of attracting both merchants and issuers to its signature debit product by using its market power in credit cards to tie signature debit network acceptance to credit card acceptance.

66.     In the early 1990s, Visa was a membership association effectively controlled by issuing financial institutions.  (In 2008, Visa Inc. went public as a for-profit corporation.)  With merchant acceptance at credit card-like interchange fees locked in, Visa's strategy by the early 1990s motivated financial institutions to issue its signature debit product.  As issuance of signature debit took hold, financial institutions added Visa branding to the front of the cards and relegated the regional PIN debit marks to the back of the card.  Thus, cards that once only had PIN debit functionality now had both signature and PIN debit functionality, and the PIN debit component was deemphasized.  Eventually, some issuers eliminated the PIN debit marks from their cards altogether.  Issuance of Visa signature debit cards rose rapidly after 1993, and many financial institutions took various steps to suppress PIN debit usage.  Visa quickly became the dominant network provider for signature debit cards in the 1990s.

67.     The HAC tying arrangement that Visa used to obtain this dominant position was challenged as an antitrust violation. *In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568 (E.D.N.Y. 2003). Visa eventually settled the lawsuit in 2003, agreeing, among other things, to eliminate the HAC tying rule and pay billions of dollars to merchants. But by the time of the settlement, Visa had obtained a substantial cardholder base with Visa signature debit cards and was already entrenched as the dominant signature debit network. With the large cardholder base using debit cards, merchants could no longer practically drop acceptance of Visa signature cards even without the HAC tie and few, if any, did.

68.     By requiring merchants to accept Visa signature debit cards despite the higher interchange rates, the HAC tying rule ensured that issuers would emphasize signature debit. Visa also took further illegal steps to ensure that it would dominate the signature debit space and that it would only face competition from MasterCard. Between 1991 and 2004, Visa maintained an exclusionary rule that precluded financial institutions that were members of Visa from issuing signature debit cards over any network other than Visa or MasterCard. As a result, networks such as Discover, the parent company of PULSE, could not use their credit card networks to also offer a signature debit network product and compete with Visa's dominant position.

69.     The Department of Justice challenged the exclusionary rule and it was found to violate the antitrust laws. *United States v. Visa and MasterCard*, 344 F.3d 229 (2d Cir. 2003). The lower court found, and the appellate court confirmed, that Discover had studied offering a competing signature debit network product, but that it was not a viable strategy "without access to banks' demand deposit accounts" and that access was precluded by Visa's exclusionary rule. *United States v. Visa and MasterCard*, 163 F.Supp. 2d 322, 393-94 (S.D.N.Y. 2001).

70. As with the settlement striking down the illegal HAC tying rule, the court order striking down the exclusionary rule came long after Visa had already cemented its position as the dominant signature debit network provider. Visa had in the meantime put into place the next stage of its strategy to maintain it debit network monopoly.

**Visa's Interlink and PIN Debit Strategy**

71. Throughout this time period, while merchants could not refuse to accept Visa's expensive signature debit cards, they could attempt to influence what authentication method was used. The credit card-style interchange levels for signature debit meant that, from a merchant perspective, PIN debit was much lower cost than signature debit. Many merchants began aggressive campaigns to encourage, or "prompt," cardholders to enter their PIN number so that the debit transactions could be processed over the lower cost PIN debit networks. Such PIN debit prompting was an ongoing threat to Visa's signature debit business.

72. By the late 1990s, while Visa dominated signature debit, it had only a modest position in PIN debit, based on its ownership of a PIN debit network, Interlink, which it acquired in 1991. As volumes were diverted from signature debit to PIN debit through prompting, Visa lost debit volumes to rival PIN debit networks.

73. To blunt the threat of PIN debit to its overall debit business, Visa sought both to increase its share of PIN debit network transactions and to influence PIN debit network interchange pricing. To accomplish these goals, Visa increased PIN debit interchange rates charged to merchants and acquirers for its PIN debit network, Interlink, and sought de facto exclusive placement from issuers for Interlink as the sole PIN debit option on debit cards. By 2004, Visa had entered into debit deals with large numbers of major debit card issuing financial institutions. These deals incented financial institutions to issue virtually all of their signature

debit cards as "Visa/Interlink" cards (*i.e.*, both the signature option (Visa) and the PIN option (Interlink) were Visa owned networks) and left merchants no choice but to route all PIN debit transactions initiated on these cards over Visa's Interlink network. To entice financial institutions to issue Interlink on an exclusive (or near-exclusive) basis, Visa offered them large volume-based rebates from the fees and assessments that these issuers paid Visa for various services, as well as substantial upfront "marketing" payments.

74. This strategy changed the debit network marketplace after 2001. In 2001, Interlink's share of PIN debit was less than 10 percent. By 2006, after Visa had entered into exclusive or quasi-exclusive deals with a number of major financial institutions, on information and belief, Interlink's share rose to over 35 percent of PIN debit transactions. By the time of the Durbin Amendment and regulations, Interlink's share of PIN debit transactions had grown to around 40-50 percent.

75. The proliferation of issuer agreements that resulted in Interlink being the exclusive PIN debit network option on many debit cards enhanced and cemented Visa's ability to increase PIN debit fees. With other PIN debit marks removed from debit cards, merchants had little or no choice but to accept the price that Interlink charged. Merchants could not route transactions to a cheaper PIN debit network. Moreover, if merchants rejected acceptance of Interlink, they would merely cause the transaction to be shifted to Visa's even more expensive signature debit network.

76. The large number of debit cards with Visa exclusives led to a dramatic increase in PIN debit interchange rates. Visa thus not only obtained a high share of PIN debit, it successfully narrowed the merchant cost gap between signature and PIN debit interchange (by raising PIN debit interchange) so as to slow the erosion of signature debit volume to PIN debit.

When the Durbin regulations were issued, between its signature and PIN debit businesses Visa's share of U.S. debit network transactions was, on information and belief, about 65-70 percent.

## THE CURRENT THREAT TO VISA'S DEBIT CARD NETWORK SERVICES MONOPOLY AND VISA'S ILLEGAL RESPONSE

77.     By 2010, Visa had long since acquired a monopoly in debit network services. That monopoly, however, was about to become subject to additional competition.  In response, Visa has undertaken a series of anticompetitive acts in order to maintain its debit card network services monopoly.

**Dodd-Frank Legislation and the Durbin Regulations**

78.     On July 21, 2010, President Obama signed into law the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. Law 111-203.  Pub. Law 111-203, 124 Stat. 1376 (2010).  This law contained a set of provisions – commonly referred to as the Durbin Amendment – relevant to debit networks.  *See* Section 920 of the Electronic Fund Transfer Act ("EFTA"), codified at 15 U.S.C. § 1693o-2a.

79.     The Durbin Amendment directed the Board of Governors of the Federal Reserve System ("Federal Reserve") to issue regulations based on the statutory language.  § 920(a)(l), 15 U.S.C. § 16930-2(a)(l) (Supp. IV 2010).

80.     On June 29, 2011, the Federal Reserve released the final implementing regulations for the Durbin Amendment (the "Durbin regulations").  12 C.F.R. § 235.1-10.

81.     The Durbin regulations have several provisions relevant to debit network services competition, including:

(a)     Regulation of Debit Network Interchange for Large Issuing Banks. Effective October 1, 2011, the Durbin regulations capped the maximum debit interchange

fee that financial institutions with more than $10 billion in assets ("regulated issuers") may receive per transaction at the sum of 21 cents, plus 5 basis points (0.05% multiplied by the transaction amount), plus one cent for fraud prevention if the issuer qualifies. 12 C.F.R. § 235.3. Smaller banks and credit unions with less than $10 billion in assets ("exempt issuers") were exempted from the cap.

(b)    Merchant/Acquirer Control Over Routing. Under the Durbin regulations, issuers and payment card networks must give merchants control of the routing of debit network transactions. 15 U.S.C. § 1693o-2(b)(1)(B). Debit networks had to be in compliance with this regulation by October 1, 2011.

(c)    Two Unaffiliated Networks Rule. The Durbin regulations prohibited issuers and debit networks from restricting "the number of payment card networks on which an electronic debit transaction may be processed to less than two unaffiliated networks." 12 C.F.R. § 235.7. This prohibition became effective October 1, 2011 for networks and April 1, 2012 for issuers. That meant that Visa's strategy of obtaining an "all-Visa" signature and PIN exclusive on a debit card was no longer legal. A merchant or acquirer thus no longer could be presented a card with debit network options from only one debit network competitor.

**The Threat to Visa's Debit Network Market Share Under the Durbin Amendment and Regulations**

82.    The Durbin Amendment and regulations were (and are) a threat to Visa's debit network services monopoly. Visa itself has acknowledged the importance of the Durbin regulations and the fact that these regulations should mean increased competition in the debit network services market, stating that "we have always been a clear leader in the U.S. debit market and thus are the primary participant with downside risk." Visa Q1 2012 Earnings Call

Transcript, p. 3.  Reflecting the threat to its monopoly, soon after the Durbin regulations were issued, Visa made numerous public statements to investors warning that its share could decline.

83.     This concern on Visa's part reflected how the Durbin regulations threatened significant new competitive pressures that should have challenged Visa's monopoly power. After the Durbin regulations were implemented, an unaffiliated debit network would have to be included on every Visa signature debit card.  As issuers included rival PIN debit networks on Visa signature debit cards, that meant a merchant or acquirer could now route PIN-authenticated transactions to other PIN debit networks.  Visa could still negotiate to include Interlink as one of the PIN debit networks included on the cards.  However, Interlink would have to compete at the point-of-sale for routing priority with the other PIN debit networks on the card.  Up until that time, Interlink's business success had not been based on winning a competition on the merits for routing priority with merchants and acquirers on cards for which there was more than one network option.  It had been based instead on PIN exclusives with debit card issuers.

84.     In the wake of the Durbin Amendment and regulations, Visa was well aware of these facts.  Reflecting its loss of PIN exclusivity, Visa noted that the "one change in the environment that we are sensitive to is that two unaffiliated networks need to be on these cards and a meaningful number of our cards today are Visa branded on the front, Interlink on the back. . . .  [T]hat puts us in a different competitive position in the post-Durbin world and these – that is the set of circumstances our strategies are aimed to address."  Visa Q3 2011 Earnings Call Transcript, p. 14.  Similarly, Visa acknowledged that its "historic[]" position as a "clear leader in the U.S. debit market" was threatened because the "new legal requirements are changing competitive dynamics and requiring all issuers to place competitive marks on their cards."  Visa Q1 2012 Earnings Call Transcript, p. 3.

85.     The potential loss of its predominant position as a PIN debit network not only risked lost profits from lower PIN debit network volumes, but also its signature debit business. Over the years, by obtaining a large share of PIN debit transactions and consistently raising interchange for Interlink transactions, Visa had sought to minimize the threat PIN debit posed to its dominant, and more lucrative, signature debit network position. That is true for multiple reasons.

86.     First, for many debit transactions, PIN debit network services pricing constrains Visa's signature debit network services pricing. Any time that Visa raises prices for its signature debit network services, it risks losing some volume to PIN debit networks. But this constraint is lessened if Visa controls a higher share of PIN debit. The higher the share of PIN debit network volume that Visa is able to retain, the more volume it will recapture if volume gets diverted from signature to PIN debit because of higher signature debit fees. As such, maintaining a higher PIN debit share allows Visa to maintain higher prices for its core signature debit network business.

87.     Second, the viability, relevance, and competitive strength of a PIN debit network are functions of its volume, share, and growth. As PULSE's share of PIN debit transactions grew historically, for example, its ability to invest in its network and compete for merchant, acquirer, and issuer business was enhanced. Among other things, the willingness of merchants, acquirers, and issuers to make complementary investments specific to a particular network is a function of that network's volume, share, and growth. By reducing the scale of competing rival PIN debit networks, Visa has blunted their ability to constrain its behavior across the debit network marketplace going forward. This effect is particularly pernicious in a technology-driven industry such as payment network services.

88.     Third, and related, if rival PIN debit networks survive and achieve their competitive potential, they would be able to offer customers a robust set of choices for processing signature-authenticated debit transactions (and other debit transactions largely processed today by signature debit networks, including transactions carried over signature debit networks where a signature is not required).   PIN debit networks such as PULSE already are investing in the ability to process signature-based transactions or offer a more attractive competitive alternative for debit transactions predominantly handled by signature debit networks. As PIN debit networks enhance their capabilities to give customers additional choices, signature debit networks would face growing competition from PIN debit networks for volumes historically carried over signature debit networks.  Such future innovation and product expansion by PIN debit networks threatens Visa's debit network monopoly.   But the ability of PIN debit networks to compete robustly and fully with these new products is impaired if Visa is able to retard their share of PIN transactions at an insufficient scale to pose a meaningful threat.   By reducing the share and competitive viability of rival PIN debit networks, Visa's conduct serves to protect Visa's signature debit business from PIN debit network innovation that could threaten its core signature debit business.

89.     This anticompetitive impetus to maintain a high share of PIN debit transactions in order to protect Visa's signature debit business remains in place post-Durbin.

**Visa's New Anticompetitive Debit Network Strategy**

90.     After the Durbin regulations were issued, Visa publicly announced that it was adopting a new debit strategy.  Visa stated that these changes were made to "adapt to the new United States regulatory environment."   Visa Q3 2011 Earnings Call Transcript, p. 2.   Visa referred to its new overall debit strategy as a "comprehensive integrated debit strategy."  Visa Q2

2012 Earnings Call Transcript, p. 4. Visa's adoption of this new comprehensive integrated debit strategy illegally maintains Visa's monopoly position and has several components.

91.     PAVD Mandate.   For several years, Visa has had the technical capability to process PIN debit transactions on its signature debit network, *i.e.*, Visa's signature debit network was functionally capable of processing a PIN authenticated transaction. Yet historically little use was made of this functionality because of the lack of marketplace demand on the part of issuers. Financial institutions that issued debit cards preferred to choose their own PIN debit networks, rather than being forced to include a Visa PIN option as part of Visa's signature debit network service.

92.     Once the Durbin Amendment took effect, this lack of marketplace demand posed a serious problem for Visa. Visa previously had negotiated contracts that led to its affiliated PIN debit network, Interlink, obtaining sole PIN placement on a large fraction of Visa signature debit cards. But such arrangements now were no longer allowed. Due to the Durbin Amendment's network exclusivity restriction, there now must be at least one unaffiliated network enabled on every Visa signature debit card. As a practical matter, that meant issuers would be including a non-Visa PIN debit network on all Visa signature debit cards, often without also including Visa's Interlink PIN network. Visa recognized that without some other way to take advantage of the dormant PIN functionality on its signature debit network, Visa's share of PIN debit transactions would fall.

93.     So Visa resorted to coercion. It imposed a new mandate, the PAVD mandate, on its signature debit issuers through a change in its network rules. Under the PAVD mandate, any financial institution that issues a Visa signature debit card must accept PIN-authenticated transactions routed over Visa's signature debit network unless, on information and belief, the

issuer already participates in Interlink for PIN. In other words, an issuer must either include Visa's PIN debit network, Interlink, on its Visa signature cards or it must enable PAVD. Whereas before an issuer could *choose* which PIN networks to include on its Visa signature cards, Visa now began dictating that the issuer *must* include Visa among its PIN-authentication options.

94. Visa is implementing the PAVD mandate even though issuers objected to the mandate. In response to such objections, Visa has simply reiterated to issuers that they must support PAVD on their Visa signature debit cards and that it would be removing the flexibility it had previously provided for issuers to choose not to support PAVD. Visa also has repeatedly warned issuers that they face substantial fines and penalties if they do not comply with the new PAVD mandate. Because of such threats, issuers and their processors have reluctantly been investing in the implementation of systems to make Visa's PIN option, PAVD, available on their Visa signature debit cards.

95. The practical effect of the PAVD mandate is to immunize Visa from the competitive processes that could result in Visa losing its presence as a PIN debit network on Visa signature debit cards. In effect, Visa is guaranteeing that even if it loses a competition with an issuing financial institution for PIN placement on a card, it will win PIN placement anyway.

96. Fixed Acquirer Network Fee ("FANF"). Soon after the Durbin regulations were finalized, Visa also announced that it would be "implementing a new fixed acquirer fee called the network participation fee which will apply to the acceptance of all Visa products and is based on both the size of the merchant and the number of merchant locations." Visa Q3 2011 Earnings Call Transcript, p. 2. At the time, Visa provided few details about its new fixed network participation fee, other than stating that it would apply to any merchant that chose to participate

on Visa's network. Visa promised to "offer additional details in the coming quarters once we've had the opportunity to further discuss these strategies with our clients and partners." *Id*.

97. Visa did not provide any further clarity for several months. Then, on February 9, 2012, Visa published a Visa Business News release that outlined the fixed network participation fee, newly named the Fixed Acquirer Network Fee (FANF). The new fee would be effective on April 1, 2012, the same day that the Durbin Amendment's network exclusivity restriction became effective. Visa reiterated that its new pricing structure was developed in response to the Durbin Amendment, stating that "[d]ebit regulation in the U.S. has altered the competitive landscape" and that "[t]o compete in the new environment, Visa has revised its business strategy." Visa Business News (February 9, 2012). This new fixed network fee is "part of the total structure we put [in] to deal with the Durbin regulation." Visa Q2 2012 Earnings Call Transcript, p. 9. The FANF thus is a response to the Durbin regulations and was imposed to counter the new competitive threats Visa faced to its debit network services monopoly.

98. The FANF imposes a monthly fixed network fee directly on an acquirer for each merchant serviced by the acquirer on Visa's network. The precise amount of the fee depends on the type of merchant and the number of merchant locations. For the majority of merchant locations, the size of the fee does not depend on how much Visa volume is transacted and thus cannot be avoided or reduced if a merchant attempts to lessen its dependence on Visa. Visa charges between $2 and $85 per month per location based on the type of merchant and the number of merchant locations. (Beginning April 1, 2015, Visa is creating new pricing tiers for very small merchant locations with less than $1,250 in sales per month where the price depends on gross sales volume.) A separate additional fee is imposed for customer-not-present transactions based on monthly gross sales volume. Fast food restaurants are subject to their own

pricing based on monthly gross sales volume. Visa Business News (February 9, 2012); Visa Business News (April 10, 2014).

99.     Visa is not providing any new service or product in exchange for imposing the FANF. Nor does this new fixed fee achieve any significant cost efficiencies or savings. Nor is there any efficiency basis for imposing a fixed fee on credit card acceptance in order to compete in debit post-Durbin. Rather, the FANF strategy is simply Visa's exploitation of its merchant-side market power so as to exclude rivals, raise prices, increase profits, and protect its debit network services monopoly.

100.    While the FANF applies directly to acquirers, the fee is based on merchant participation in Visa's network. Acquirers pass on some or all of the FANF to merchants.

101.    The FANF must be paid once a merchant accepts any Visa credit card or debit card product. A merchant thus cannot avoid the FANF unless it takes the draconian step of dropping the acceptance of all Visa products. When asked "will merchants be able to opt out [of the FANF] if they don't want to go along with the program and stick with the old variable structure,?" then-Visa CEO Joseph Saunders bluntly stated that "as it relates to an opt out, they can opt out if they don't want to accept Visa cards." Visa Q3 2011 Earnings Call Transcript, p.13. Simply put, paying the FANF and acquiescing in the new pricing structure is necessary for a merchant to be "eligible" to "accept credit, debit, prepaid, all Visa products." *Id*.

102.    The FANF generates an enormous amount of annual new revenues for Visa. In a report released a few days after the February 2012 announcement of the FANF, the research analysts at Keefe, Bruyette & Woods estimated that the FANF would generate somewhere between $540 million and $2.2 billion annually in revenues for Visa, with a mid-point estimate of around $1.1 billion. Morgan Stanley similarly estimated a range between $288 million and

35

$1.9 billion annually, with a mid-point estimate somewhere between $480 million and $960 million. On information and belief, Visa's own subsequent financial reporting indicates that it is deriving an estimated $600-$900 million in additional annual revenues due to the FANF.

103. Visa has elsewhere stated that its pre-Durbin Interlink PIN debit business accounted for around 2.8 percent of its global revenues, suggesting that PIN debit revenues accounted for around $300 million in annual revenues for Visa pre-Durbin. Visa Q2 2012 Earnings Call Transcript, p. 14. Some significant fraction of the revenues generated from PIN debit transactions is generated from issuers, meaning that the amount of historic network fees paid by merchants and acquirers to Visa/Interlink for PIN debit network processing was substantially less than $300 million.

104. A FANF that generates $600-$900 million in annual revenues for Visa would thus produce revenues from merchants and acquirers substantially greater than Visa's entire U.S. PIN debit business generated prior to the Durbin Amendment. In these circumstances, Visa has the ability to drive per-transaction PIN debit transaction fees on merchants and acquirers to zero, win routing priority for all PIN debit transactions in which Interlink or PAVD is enabled, and still generate larger profits through the new FANF price structure.

105. By extracting about $600-$900 million in additional fixed fee revenues from merchants and acquirers annually, Visa's integrated FANF pricing structure effectively means that merchants and acquirers have to pay twice if they route debit transactions to any network other than Visa – paying both the per-transaction fee charged by the rival PIN debit network *plus* the FANF to Visa.

106. Visa's FANF price structure created a different form of pricing than had previously been used in the industry. Visa recently commented that its revenues were growing

faster than transactions because of new "US debit fees implemented in 2012" and that "about the pricing structure that we implemented back in 2012," it was a "very different pricing structure than the one we had previous to that point." Visa Q4 2014 Earnings Call Transcript, pp. 4, 17. On information and belief, Visa is implementing this new FANF price structure only in the United States.

107.    <u>Volume Agreements with Merchants and Acquirers</u>.    To preserve its debit network services monopoly, Visa is using the FANF as part of an overall integrated strategy to both exclude competitors and raise debit network fees on merchants and acquirers. At the same time that it announced the new fixed network fee, Visa indicated that it would "extend to merchants of all sizes through direct negotiations and through acquirers, the successful partnership program we have historically offered issuers." Under the new volume agreements, a "broad set of acquirers and merchants can receive incentives from Visa in exchange for routing commitments." Visa Q3 2011 Earnings Call Transcript, p. 3.

108.    Visa has not publicly announced details of how the new volume agreements are structured, although Visa has indicated that the typical duration is about two years. Visa Q4 2011 Earnings Call Transcript, p. 8. On information and belief, the agreements typically include volume or share targets that permit merchants and acquirers to partially offset the burden of the FANF based on meeting debit transaction targets. The agreements may include separate PIN and signature debit targets and/or an overall debit target that effectively requires the merchant to continue providing Visa with its historic signature debit volumes. The agreements may include volume targets that need to be met on a quarterly basis, denying merchants greater flexibility over the course of a year to permit other networks to process transactions. In some cases, the agreements may not include express volume targets, but rather trigger a discount or rebate

through placement of Visa at the top of the routing table, leading to the desired shift in volume. Depending on the agreement, the precise mechanism of discounts or rebates may involve reducing debit network or other fees, providing lump sum rebates, reducing or rebating the FANF directly, or reducing some other revenue stream that Visa charges to merchants or acquirers. The discounts or rebates have a cumulative structure such that a merchant or acquirer risks losing the benefit of the discounts or rebates across all the targeted volume if it does not meet the volume or share targets. Visa has over 100 such volume agreements with key merchants and acquirers. Visa Investor Day, p. 24 (June 6, 2013).

109. The FANF and volume agreements are intertwined parts of Visa's post-Durbin integrated debit strategy. Visa has stated the FANF "is not a fee that sits on top of what merchants are paying" (Visa Q3 2011 Earnings Call Transcript, p. 13), but instead is being implemented in an integrated way such that the fixed fee is intertwined with lower variable per-transaction fees. Visa thus has emphasized that "variable fee reductions are obviously an offset to the fixed fee." Visa Q3 2011 Earnings Call Transcript, p. 10-11. Visa later reiterated that the "FANF is one part of a much more comprehensive fee restructuring, which was combined with a lowering of our per-transaction cost, in addition to the introduction of merchant incentives to encourage routing." Visa Q1 2013 Earnings Call Transcript, p. 13.

110. The key to Visa's plan is to combine the fixed fee with lower per-transaction fees for debit in order to obtain routing priority while still increasing overall debit revenues and profits. Given the volume agreements' pricing structure, the agreements create an economic incentive to route all volume targeted in the agreements to Visa/Interlink. Under Visa's integrated plan, the FANF is the proverbial "stick" to be used in conjunction with a "carrot" of the volume agreements. A merchant or acquirer thus can seek to reduce the increased burden of

the fixed fee by entering into such volume agreements with Visa and meeting the targets. Because many merchants will make a choice simply to place Visa at the top of its routing table to meet the targets, the effect of the FANF strategy will be that rival PIN debit networks will lose all of their volume at such merchants for any debit cards for which Visa is a routing option.

111. In so offering these agreements, Visa is not offering merchants lower overall debit network fees. After accounting for the fixed fee as part of the FANF price structure, merchants on average are paying *higher* network fees under the new FANF price structure even after receiving lower debit network per-transaction fees. Indeed, on information and belief, a merchant typically pays a *higher* network fee under the FANF price structure even if it has a volume agreement with Visa and routes all debit transactions to Visa for which Visa is an option. Visa's strategy *raises* overall debit network fees on merchants and acquirers while using the new FANF price structure to prevent rival networks from undercutting its price increases and to deny rival PIN debit networks the share needed to challenge Visa's dominant position in debit, particularly signature debit.

112. The fact that this new integrated debit strategy will lessen competition against Visa is well understood. One market analyst commented after the new strategy was announced: "Visa prefers not to compete on price with its variable rate for fear it could lose some routing business. . . . If they establish a network-participation fee, and lower their variable fee, they will always have a lower variable [fee] than the competition." David Heun, "Acquirers Await Details of Visa's New Fee Payments," www.paymentssource.com (February 13, 2012). In short, "Visa views the network fee as a way to avoid competition over variable fees in light of requirements under the Durbin amendment." *Id*.

113.    While the integrated FANF price structure means *higher* overall network fees, the structure itself undermines rival networks' ability to undercut the price increase.  Normally, a price increase leads to greater competition from rivals, but rival PIN debit networks cannot constrain the FANF price increase.  To do so would require a merchant to be willing to drop Visa entirely in order to avoid the FANF.  Given Visa's market size and power, the option of dropping Visa entirely is rarely, if ever, feasible economically.  By precluding normal price competition on the merits, the integrated FANF price structure impairs the ability of equally or more efficient rival PIN debit networks to compete.  As a result of this lessened competitive constraint from rival PIN debit networks, Visa is now able to raise its overall debit network fees – fixed network fees plus per-transaction fees – charged to merchants and acquirers.  At the same time, Visa is able to increase its share of PIN debit transactions, resulting in PIN debit networks posing less of a competitive threat to its debit business.

114.    <u>Protecting Signature Debit from PIN Debit Network Competition.</u>  Beyond how Visa integrates its volume agreements with the FANF price structure to reduce rivals' share of PIN debit transactions, Visa also is using the agreements directly to exclude rival PIN debit networks from competing against its dominant signature debit business.  PIN debit networks such as PULSE are developing products to compete for debit transaction volume historically carried over signature debit networks.  Such products include network products that will process signature-authenticated transactions, products that will process Internet and other "card not present" debit transactions, and products permitting small dollar transactions without any cardholder authentication.  Because signature debit networks charge higher network fees than PIN debit networks, Visa's signature debit business is vulnerable to expansion by PIN debit networks undercutting its fees.  Such expansion by PIN debit networks into signature debit, now

nascent, would introduce competition benefitting customers by lowering signature debit network fees.

115.     PIN debit networks, however, face significant barriers to expanding into signature debit.  In particular, PIN debit networks need to solve a "chicken and egg" problem in which they attract interest on both the merchant and issuer sides of the market to develop and market such new network products successfully.  Beyond the investment by the network itself, developing these new products requires complementary investment by acquirers and issuers.  If a network lacks sufficient scale and prospects for growth, those shortcomings will undercut the opportunity for the new products to receive sufficient interest on both sides of the market to succeed.

116.     Visa's integrated debit strategy is aimed at maintaining and increasing those barriers.  As an initial matter, Visa's integrated debit strategy, by reducing rival PIN debit networks' share of PIN debit transactions, will impair such networks' ability to compete for debit transactions historically processed over signature debit networks by reducing the networks' overall scale and relevance.

117.     Beyond that, Visa is taking more direct steps to preclude such competition.  First, on information and belief, Visa's merchant and acquirer volume agreements specifically or effectively condition the payment of rebates on the merchant or acquirer reaching Visa signature debit or debit volume targets.  These targets are intended to maintain, and have the effect of maintaining, Visa's signature debit business by foreclosing rival networks' ability to achieve sufficient volume to solve the "chicken and egg" problem and successfully enter the signature debit space.  Indeed, in response to PULSE's development of such new products, acquirers have

told PULSE that the volumes for which PULSE wants to compete are already committed under Visa's volume agreements.

118.    Through such volume commitments, Visa undercuts PULSE's (and other PIN debit networks') ability to compete for signature debit network volume.  Because PULSE's ability to compete for signature debit network volumes relies on investment not only on its part but also on the part of other market participants, foreclosing a critical mass of volume poses significant problems for nascent product development and expansion.  This complementary investment will not occur if Visa agreements preclude the existence of a sufficient amount of shiftable volume so as to make the investment profitable.  Visa's agreements with merchants and acquirers are serving to maintain barriers to entry blocking rival PIN debit networks' efforts to compete for signature debit network business.  Moreover, upon information and belief, Visa representatives have communicated to merchant acquirers that Visa's willingness to enter into volume agreements is linked to an acquirer's resistance to working with PULSE or other PIN debit networks in developing its capabilities to compete for Visa's traditional signature debit business.

119.    Second, on information and belief, Visa also is taking steps in its agreements with issuers to preclude new competition.  Visa is structuring and enforcing its agreements with issuers in such a way as to penalize the issuer if it participates with PULSE or other PIN debit networks in efforts to develop new products to compete with Visa's signature debit business.  In so doing, Visa's conduct serves to reduce the amount of issuer participation with the new products, which in turn denies a critical mass of potential volume that might induce acquirer interest in the product.  Visa once again is seeking through exclusionary conduct to deny rival

networks the scale and market relevance needed to enter and compete for signature debit business.

120. <u>Visa's Illegal Conduct Is Having a Substantial Effect on Its Volume and Market Share.</u> Absent Visa's illegal conduct, the debit network services marketplace would be evolving quite differently than it is today. Because of Visa's conduct, competition has been lessened, the competitive constraints imposed by other PIN debit networks have diminished, and the total amount of network fees that merchants, acquirers, and issuers are paying for debit network services has increased, as compared to how the market would have evolved absent Visa's illegal conduct.

121. After the Durbin regulations were announced, one former Visa executive suggested that "Visa could lose 50% to 80% of its PIN-debit volume." Andrew Johnson, "MasterCard Debit Prices Hold Steady," www.paymentssource.com (August 8, 2011). Consistent with that, Interlink's share of PIN debit transactions shrank significantly in the immediate period after the Durbin regulations were implemented. Visa itself acknowledged this loss of volume to investors, noting in particular that it "experienced notable deterioration" in its Interlink volumes after Durbin was implemented in early 2012, with losses "pick[ing] up momentum during the March quarter and accelerated in April." Visa Q2 2012 Earnings Call Transcript, pp. 4, 7. While Visa's illegal strategies reduced the level of this immediate loss of PIN volume, these initial effects provide a conservative glimpse for how the marketplace would have evolved but-for Visa's illegal conduct.

122. Since that initial loss in PIN share, Visa has been clawing back the previously lost volume through its illegal conduct. This illegal claw back has been so successful that "U.S. debit is re-emerging as a driver of growth." Visa Investor Day, p. 24 (June 6, 2013). Visa's debit

network volume is higher than it has ever been and Visa continues to gain market share. Visa's illegal strategy is having substantial effects on market outcomes.

**The Broader Purpose and Intent of Visa's Anticompetitive Debit Strategy Is to Protect Its Signature Debit Business**

123. The crux of Visa's debit monopoly is its dominant position as a signature debit network. There are only two signature debit networks with any substantial market presence: Visa and MasterCard. Between those two firms, Visa has always been the dominant player. The result of such limited competition is higher signature debit network prices. MasterCard executives commented last year that even when Visa and MasterCard compete, there is "less pricing compression" in signature debit than PIN debit because there are only "two" signature debit networks versus "nine" PIN debit networks. MasterCard noted that "nine versus two" makes a big difference in terms of pricing, analogizing it to when you "go to a dance as a guy and there's nine ladies dancing, the prices are different" than if there are two, in which case "the price goes up." MasterCard Investment Community Meeting, pp. 47-48 (September 11, 2013).

124. Reflecting the lesser competition among signature debit networks, network fees are much higher for signature debit networks than PIN debit networks. PULSE's 2013 Debit Issuer Study found that typical network fees for large financial institutions with $10 billion or more in assets are 4.8 cents per signature debit transaction compared to 1.1 cents per PIN debit transaction. For smaller financial institutions with less than $10 billion in assets, the costs are also higher, 7.4 cents per signature debit transaction versus 3.0 cents per PIN debit transaction. The Federal Reserve similarly found that signature debit network fees per transaction were higher for both the larger issuers (3.8 cents per signature debit transaction versus 0.6 cents per PIN debit transaction) and smaller issuers (9.4 cents per signature debit transaction versus 3.9 cents for PIN debit transactions) in 2013. 2013 Federal Reserve Reg. II Study, Table 9. For

acquirers, the Federal Reserve found that network fees were almost double for signature debit transactions compared to PIN debit transactions (7.0 cents per signature debit transaction versus 3.6 cents per PIN debit transaction). *Id.*, Table 8. While the network fees for any particular transaction will reflect the specifics of a network's arrangement with an acquirer or issuer, these numbers reflect the broader reality that signature debit networks face much less competitive price pressure than PIN debit networks.

125. For Visa, these higher network fees imply much higher profits, and Visa has historically generated the bulk of its debit network revenues from its signature debit network business. Protecting its signature debit network business from greater competition therefore has always been a central goal of Visa's debit strategy. Visa's current anticompetitive strategy, with its focus on blocking PIN debit networks from entering the signature debit space, reflects an approach consistent with its overall history. It further reflects a strategy, also consistent with its overall history, of maintaining a greater share of signature-authenticated debit transactions relative to PIN-authenticated debit transactions.

126. Beyond that, from Visa's perspective, there is also much to be gained if the competitive structure for PIN debit is much more like signature debit. Accordingly, Visa's current debit strategy is aimed at eliminating or marginalizing rival PIN debit networks.

127. Visa's illegal conduct has sparked action by MasterCard that reinforces this goal. Visa and MasterCard were once owned by the same financial institutions and they have a long history of not competing aggressively against each other, as suggested by the fact that signature debit network fees are higher. Since Visa announced its new illegal debit strategy, for example, MasterCard is becoming more insistent in requiring compliance with its own version of the PAVD mandate, called the Maestro mandate, whereby any issuer of a MasterCard signature

debit card must also include MasterCard's PIN debit network, Maestro, on the card. MasterCard's Maestro mandate tying arrangement is assisting significantly in its ability to increase its share of PIN debit transactions. As MasterCard moves forward in this way, Visa's goal of re-making the debit network marketplace to mirror the lessened competition within signature debit is enhanced.

128. Visa's illegal conduct also will serve to protect its debit network services monopoly as other forms of payment, such as transactions initiated through the use of mobile devices, become more popular among consumers. As these payment forms evolve and take hold in the marketplace, Visa's continued monopoly power gives it the ability to control how some of these new technologies will enter the marketplace and to do so in a way that will exclude PIN debit network rivals, further solidifying its monopoly position and resulting in higher network fees for these services. This adverse effect resulting from Visa's illegal maintenance of its debit network services monopoly harms competition and consumers on its own terms, but also may be amplified by further Visa exclusionary conduct specific to how new technologies are developed and sold in the marketplace. Visa's conduct with respect to new forms of payment also shows its specific intent to maintain its monopoly.

129. Visa's specific intent to maintain its monopoly and to use its continued monopoly power to exclude rivals is further shown by other recent conduct. The payments industry in the United States is beginning to use debit cards that include a digital chip designed to enhance security. These chips employ the "EMV" standard (EMV stands for Europay, MasterCard, Visa). On each card, an application based on the EMV standard will be included on a digital chip and all Visa signature debit cards will include Visa's proprietary EMV application.

130.    Visa has sought to use EMV to exclude competition from PIN debit networks for its signature debit business.  For example, Visa took the position throughout much of 2013 that while it would permit merchants and acquirers to route to other PIN debit networks for PIN-authenticated transactions on EMV-enabled Visa signature cards, it would not permit the nascent competition being developed by PULSE and other PIN debit networks for Visa's signature debit business.  Thus, for example, if an acquirer sought to have PULSE process a signature-authenticated transaction on an EMV-enabled Visa card, Visa said it would prohibit the transaction.

131.    Throughout 2013, Visa's requirement excluding such competition stymied and impeded progress in getting the industry to agree on a solution that would facilitate the rollout of EMV within the United States.  After the security breach at Target in late 2013 led to media and Congressional scrutiny of security issues within the industry, Visa modified its position.  Visa then implemented its EMV strategy in a manner that no longer prohibited all competition for its signature debit business in the context of an EMV transaction, but still limited competition by, for example, imposing itself as the priority network to be chosen for any EMV debit transaction on a Visa signature card.  On information and belief, Visa only modified its position in the face of public scrutiny of security issues, which cast a light on its actions that were slowing down the rollout of EMV within the industry.  The fact that Visa has sought, and continues to seek, to use the EMV standard to cement its place within the debit network business generally, and the signature debit network business specifically, further shows Visa's specific intent to maintain its debit network services monopoly and its ability to use its continued monopoly power to do so.

132.    Throughout the relevant period, Visa has provided general purpose credit card and debit card network services to a very large number of issuing financial institutions, acquirers, and merchants throughout the United States.  These services affect a substantial amount of interstate commerce.  According to Visa's published operating performance data, as of December 2013, there were over 288 million Visa-branded credit cards and over 439 million Visa-branded debit cards in circulation within the United States.  These cards have been involved in trillions of dollars of credit card and debit card transactions in the United States and throughout the world.

**RELEVANT MARKETS**

133.    Visa participates in two separate product markets in the United States relevant to this Complaint: the general purpose credit and charge card network services market ("credit and charge network" market) and the general purpose debit card network services market ("debit network" market).  Within the broader U.S. general purpose debit card network services market, there is a separate relevant product market (sometimes also called a "submarket") for general purpose signature debit card network services.  For purposes of competing for placement on debit cards on the issuing side of the market, PIN debit networks also compete within a separate relevant product market (or "submarket") within the broader general purpose debit card network services market.

**General Purpose Credit and Charge Card Network Services Product Market**

134.    Consumers use general purpose credit and charge cards to make purchases at multiple, unrelated merchants without accessing or reserving the customer's funds at the time of purchase.

135. A general purpose credit card or charge card network provides the services necessary at a network level to process general purpose credit and charge card transactions. General purpose credit and charge card networks provide the infrastructure and mechanisms through which general purpose credit and charge card transactions are conducted, including the authorization, clearance, and settlement of transactions.

136. A relevant product market exists for general purpose credit and charge card network services. Visa, MasterCard, American Express, and Discover compete as sellers of general purpose credit and charge card network services.

137. The general purpose credit and charge card network services market is a two-sided market in which networks are the sellers, and issuers, acquirers, and (directly or indirectly depending on the network) merchants are the customers. Issuers on one side of the market and acquirers and merchants on the other side of the market provide each other with significant network effects. Networks compete separately on both sides of the market to attract issuers, merchants, and acquirers.

138. Merchants accept general purpose credit and charge cards because many of their customers prefer that means of payment and because it would be unprofitable to risk losing customers by not accepting such cards. In turn, merchants that accept general purpose credit and charge cards must purchase general purpose credit and charge card network services, *i.e.*, merchants wanting to accept general purpose credit and charge cards cannot replace general purpose credit and charge card network services with other services or reduce usage of these services, even if the cost for using general purpose credit and charge card network services rises substantially. Although other means of payment exist, none of these alternative means of payment alters the fact that merchants find it profitable to accept general purpose credit and

charge cards and there is no substitute for using general purpose credit and charge card network services if general purpose credit and charge cards are to be accepted. Because of this demand by merchants to offer customers the option to pay using general purpose credit and charge cards, and because general purpose credit and charge cards network services are essential to meeting this demand, there are no products or services that are reasonably interchangeable with those provided by general purpose credit and charge card networks. A small but significant, non-transitory increase in the network fees charged merchants and acquirers by all general purpose credit and charge card network services providers would not cause a sufficient decrease in the demand for general purpose credit and charge card network services so as to make the price increase unprofitable.

139. Merchants do not view general purpose credit and charge card network services as reasonably interchangeable with general purpose debit card network services. Even in light of repeated, significant, non-transitory increases in the cost of general purpose credit and charge card network services, merchants have continued to accept general purpose credit and charge cards because many customers prefer the convenience, widespread acceptance, and, particularly, the deferred payment options associated with general purpose credit and charge cards.

140. The general purpose credit and charge card network services market is separate from relevant markets related to the issuance of general purpose credit and charge cards.

141. In a case involving Visa that was previously litigated in the Second Circuit, the court affirmed the existence of a relevant product market for general purpose credit and charge card network services. *U.S. v. Visa U.S.A., Inc.*, 344 F.3d 229, 239 (2d Cir. 2003). As the court stated, "issuance and acceptance of credit and charge cards is so profitable…that even a large increase in network fees would not provide a rational financial incentive to abandon the business

of issuing or accepting payment cards." *Id.* The lower court in the same litigation noted that "merchant consumers exhibit little price sensitivity and the networks provide core services that cannot reasonably be replaced by other sources." *Visa U.S.A., Inc.*, 163 F. Supp. 2d at 338.

142. It has also been held that general purpose credit card network services are not reasonably interchangeable with general purpose debit card network services. *In re Visa Check/MasterMoney Antitrust Litig.*, No. 96-CV-5238, 2003 WL 1712568, *2, *7 (E.D.N.Y. Apr. 1, 2003) ("*In re Visa Check*"). The Court found that "[o]verwhelming evidence demonstrates that merchant demand for credit card services is distinct from merchant demand for debit card services." Visa offers both general purpose credit card network services and general purpose debit card network services and separately markets, prices, and sells these two services.

143. For purposes of this Complaint, the general purpose credit and charge card network services market is relevant for showing that Visa is a "must have" with the market power to impose the FANF on merchants and acquirers. To establish such market power, in the alternative, a narrower relevant market exists for general purpose credit card network services, *i.e.*, excluding general purpose charge card network services. A small but significant, non-transitory increase in the network fees charged merchants and acquirers by all general purpose credit card network services providers would not cause a sufficient decrease in the demand for general purpose credit card network services so as to make the price increase unprofitable. Visa's market power can be established by reference to either of these alternative market definitions.

**General Purpose Debit Card Network Services Product Market**

144. Cardholders use general purpose debit cards to make purchases at multiple, unrelated merchants by directly accessing and debiting funds from their deposit accounts. Such

general purpose debit cards include pre-paid cards, cards that access health care savings accounts, and other similar cards that have the feature of debiting funds in an account and the ability to be widely used at unrelated merchants.

145. A general purpose debit card network provides the services necessary at a network level to process debit card transactions. Debit networks provide the infrastructure and mechanisms through which debit card transactions are conducted, including the authorization, clearance, and settlement of transactions.

146. A relevant product market exists for general purpose debit card network services. Market participants include Visa, MasterCard, PULSE, and numerous other PIN debit networks.

147. The general purpose debit card network services market is a two-sided market in which networks are the sellers, and issuers, acquirers, and (directly or indirectly depending on the network) merchants are the customers. Issuers on one side of the market and acquirers and merchants on the other side of the market provide each other with significant network effects. Networks compete separately on both sides of the market to attract issuers, merchants, and acquirers.

148. Merchants accept debit cards because many of their customers prefer that means of payment and it would be unprofitable to risk losing customers by not accepting debit cards. In turn, merchants that accept debit cards must purchase general purpose debit card network services, *i.e.*, merchants wanting to accept debit cards cannot replace general purpose debit card network services with other services or reduce usage of these services, even if the cost for using debit network services rises substantially. Although other means of payment exist, none of these other means of payment alters the fact that merchants find it profitable to accept debit cards and there is no substitute for using general purpose debit card network services if debit cards are to

be accepted.  Because of this demand by merchants to offer customers the option to pay using debit cards and because debit network services are essential to meeting this demand, there are no products or services that are reasonably interchangeable with those provided by debit networks. A small but significant, non-transitory increase in the network fees charged merchants and acquirers by all general purpose debit card network services providers would not cause a sufficient decrease in the demand for general purpose debit card network services so as to make the price increase unprofitable.

149.    Similarly, even though consumers have access to other means of payment, such as checks and cash, consumers prefer debit cards in a wide variety of payment contexts.  Therefore, a financial institution will want to issue debit cards to attract depositors.  In order to meet depositor demand, debit network services are essential and there is no reasonably interchangeable substitute for the services that debit networks provide.  A small but significant, non-transitory increase in the network fees charged issuing financial institutions by all general purpose debit card network services providers would not cause a sufficient decrease in the issuing by financial institutions of debit cards to their customers so as to make the price increase unprofitable.  It also would have no significant effect on cardholder usage of debit cards versus other means of payment, such as checks and cash.

150.    Within the general purpose debit card network services market, signature debit networks and PIN debit networks offer products differentiated from each other.  Generally, PIN and signature debit network services are reasonably interchangeable substitutes.  Many merchants, for example, compare the cost of signature debit and PIN networks and will seek to prompt consumers to switch between different types of authentication in order to lower their cost

of using debit network services.  Such merchant-induced substitution plays an important role in the debit network services marketplace.

151.    Similarly, from an issuer perspective, signature and PIN debit networks compete with each other in terms of pricing and product quality (*e.g.*, fraud prevention).  Any differences in pricing and product quality will cause issuers to seek to influence cardholder behavior in terms of choice of authentication.  Historically, issuers have done so in various ways, including through rewards, fees for PIN usage, and instructions to cardholders on how to respond to merchant prompting.  While many financial institutions during the pre-Durbin period encouraged signature use because of higher interchange, those same financial institutions may have an incentive post-Durbin, all else being equal, to incentivize greater PIN usage because of its lower fraud risks and fees.  In all these senses, issuers view signature debit and PIN debit networks as reasonably interchangeable substitutes.

152.    After Visa's Honor All Cards tying requirement was eliminated (as agreed in its settlement of antitrust litigation), signature and PIN debit network interchange rates began converging, while signature debit card and credit card network interchange rates began diverging.  Such convergence and divergence, respectively, reflects that signature debit and PIN debit network services are partial substitutes in the same broader product market, and debit card network services and credit card network services are in separate product markets.

153.    The Durbin Amendment and regulations imposed a cap on interchange for large financial institution issuers.  Since that cap became effective, debit interchange rates have fallen, yet there has been no similar decline in credit card interchange fees.  Such a continuing divergence also reflects that debit card network services and credit card network services are in separate product markets.

## Separate Signature Debit Network Services Market Within the Debit Network Services Market

154. While signature and PIN debit network services are often reasonably interchangeable substitutes, these two types of network services compete in their own differentiated product space in important ways. On the merchant side of the business, signature debit has an important element of differentiation that gives signature debit networks a distinct power over merchants and acquirers. For some merchants and uses of debit cards, PIN debit network services are currently a weak or nonexistent substitute. For example, many merchants are not equipped with PIN pads, whether because of lack of space, because such pads are inconsistent with the business model (*e.g.*, tipping in restaurants or delayed fulfillment in the travel business), or other reasons. Over the Internet and in other contexts, card-not-present signature debit transactions occur for which PIN debit is often viewed by merchants as an inadequate substitute. Many cardholders prefer using signature authentication, in part because issuers have historically incented signature usage, and such cardholders can be resistant to merchant attempts to prompt PIN usage instead. Some users of debit cards also do not know their PIN number. For such reasons, from a merchant perspective, there is a separate merchant demand for signature debit network services, and PIN debit is not a reasonably interchangeable substitute for signature debit for all debit network transactions.

155. Signature debit networks have the ability profitably to target merchants and uses of debit network services for which PIN debit network services is a weak or nonexistent substitute. Signature debit networks can exploit this lack of competition by discriminating against those merchants and uses in pricing their services.

156. The fact that average merchant network fees for signature debit network services are higher than for PIN debit network services reflects, in part, the fact that a separate relevant

product market (or "submarket") for signature debit network services exists within the broader general purpose debit card network services market. A small but significant, non-transitory increase in network fees by all signature debit network services providers targeted at the merchants and uses for which PIN debit is a weak or nonexistent substitute would not cause a sufficient decrease in the demand for signature debit network services so as to make the price increase unprofitable.

157.    On the issuing side of the business, signature and PIN debit networks also compete in their own differentiated product space in important ways and financial institutions generally make separate decisions when choosing among signature and PIN debit networks. In particular, there is a specific demand for signature debit network services separate from PIN debit network services. Since many more merchants accept signature debit than PIN debit and PIN debit is not a complete substitute for signature debit for all uses of debit cards, PIN debit network functionality alone would provide less network coverage for consumers than provided by signature debit network services. As a result of this separate demand for signature debit network services by issuers, there is a competition to be the signature debit network placed on a debit card that is distinct from the competition to be a PIN debit network placed on the card.

158.    Given this separate demand for signature debit network services, there is a more localized competition within the overall general purpose debit card network services market to be the signature debit network provider on a card. Visa dominates this competition. The fact that average issuer network fees for signature debit network services are higher than for PIN debit network services reflects, in part, the fact that signature debit network services is a separate, relevant product market within the broader debit network services market. A small but significant, non-transitory increase in network fees by all general purpose signature debit card

network services providers targeted at issuers would not cause a sufficient decrease in the demand for signature debit network functionality on debit cards so as to make the price increase unprofitable.

**PIN Debit Market for Issuer-Side Card Placement**

159.     Similarly, there is a separate competition among PIN debit networks to be placed on debit cards.  Issuers have a separate demand for PIN debit network services in order to maximize usage of debit cards and because PIN debit network services have superior product attributes in terms of lower fraud and the ability to offer cash back.  Moreover, post-Durbin, given that there must be two unaffiliated networks on each card and issuers only include one signature debit network, there is a specific demand to include one or more PIN debit networks on each card to comply with the Durbin regulations.  For purposes of competing for issuer placement on debit cards, PIN debit networks compete within a separate relevant market (or "submarket") within the broader general purpose debit card network services market.

**Geographic Markets**

160.     The relevant geographic market for both the general purpose credit and charge card network services market and the general purpose debit card network services market is the United States.  The United States also is the relevant geographic market for narrower product markets within these product markets.

161.     With respect to general purpose credit and charge card network services, while the U.S. networks all operate internationally, they have separate rules and pricing governing services in the United States.

162.     Almost all of the general purpose credit and charge cards issued by financial institutions in the United States are issued to domestic cardholders who use their cards

predominantly at merchants located in the United States. Merchants would not consider a general purpose credit and charge card network operating outside of the United States to be a reasonably interchangeable substitute for networks operating in the United States.

163. Competition among issuers also occurs at the national level. The advertising, marketing, and brand recognition campaigns undertaken by general purpose credit and charge card issuers are national in scope.

164. It has previously been found that the United States is the relevant geographic market for the general purpose credit and charge card network services market. *U.S. v. Visa U.S.A., Inc.*, 163 F.Supp. 2d 322, 340-341 (S.D.N.Y. 2001).

165. The United States is the relevant geographic market for the general purpose debit card network services market for similar reasons. Debit networks operating within the United States are national in scope, there are separate rules and pricing specific to the United States, and competition for merchants, acquirers, and issuers occurs at a nationwide level. The Durbin Amendment and regulations also apply only in the United States. The FANF, the PAVD mandate, and the other illegal conduct described in this Complaint also is specifically focused on the United States.

## MARKET POWER AND MONOPOLY POWER

**Visa's Market Power in the General Purpose Credit and Charge Card Network Services Market**

166. On the merchant side of the business, Visa has market power in the general purpose credit and charge card network services market in the United States. Today, Visa accounts for approximately 45% of all general purpose credit and charge card transactions. Within a narrower general purpose credit card network services market, Visa's share of transactions would be approximately 55% to 60%.

167.    Merchant acceptance of Visa credit cards is widespread with close to 100% of all merchants accepting credit cards accepting Visa.  Merchants accept Visa credit cards because of the preferences of their customers.  Approximately 75% of all credit card carrying cardholders carry a Visa card and some customers strongly prefer using a Visa credit card.  If a merchant does not accept Visa credit cards, it is at risk of losing sales to competing merchants.  Few, if any, merchants are willing to risk the loss of retail sales to rival retailers by stopping their acceptance of Visa credit cards.  The resulting loss in retail profits makes Visa acceptance a "must have" for a large number of merchants, including all or virtually all merchants currently accepting Visa credit cards.

168.    Despite technological advances that have decreased costs associated with processing credit card transactions, Visa has increased the fees that acquirers (and thus merchants) pay without losing sufficient merchant acceptance or transactions to make the fee increases unprofitable.  As the Southern District of New York has previously ruled, Visa has in the past "raised interchange rates charged to merchants a number of times without losing a single customer as a result."  *United States v. Visa U.S.A., Inc.*, 163 F.Supp. 2d 322, 340 (S.D.N.Y. 2001).

169.    Visa's market power is protected by substantial barriers to entry and expansion.  The Southern District of New York has previously ruled that "there are significant barriers to entry in the general purpose card network services market."  *Id*. at 342.  The Antitrust Division of the Justice Department recently similarly concluded, as part of its settlement of antitrust litigation against Visa and MasterCard, that "[s]uccessful entry today would be difficult, time consuming, and expensive."  Competitive Impact Statement, Proposed Final Judgment in *United States v. American Express Company et al.*, 7 (E.D.N.Y. Oct. 4, 2010).

170. There has been no significant entrant into the general purpose credit and charge card network services market since the 1980s. Large and costly investments are necessary to build a network and develop the brand name to succeed as a payment network. An entrant must also achieve substantial parity of merchant acceptance to compete effectively, which is very difficult to achieve.

171. The Second Circuit has previously held that Visa has market power in the credit and charge card network services market. *United States v. Visa U.S.A., Inc.*, 344 F.2d 229, 238-39 (2d Cir. 2003).

**Visa's Monopoly Power in the Debit Network Services and Signature Debit Network Services Markets**

172. Visa has monopoly power in the general purpose debit card network services market in the United States. As of 2011, when it announced and began implementing its new integrated debit strategy, on information and belief, Visa accounted for an estimated 65-70% of all debit network transactions.

173. Visa has monopoly power in the general purpose signature debit card network services market in the United States. In terms of signature debit transactions, on information and belief, Visa accounted for about 70-80% of all signature debit network transactions as of 2011.

174. Visa's monopoly power in these markets is protected by substantial barriers to entry and expansion. Entry into the debit network services marketplace is very difficult, time consuming, and expensive. To enter, a new network would have to incur substantial costs in developing a network, brand name, and other infrastructure. In addition, a new debit network would need to overcome the network effects that can form a barrier to entry (*i.e.*, solving the "chicken-and-egg" problem of attracting both merchants and issuers to the network), which would be very costly to achieve.

175.    Entrance into the signature debit network services business raises particularly acute problems.  Many merchants do not have PIN pads, and a widespread merchant acceptance network with signature authentication is particularly important for an issuer in order to provide the widest breadth of merchant acceptance for a debit card.  Moreover, unlike credit cards, where many cardholders carry more than one card, a debit card accesses the cardholder's deposit account and the vast majority of debit cardholders only carry one debit card.  If a merchant does not accept the debit card, it is unlikely a cardholder can pull out another debit card.  Therefore, successful entry of a signature debit network requires achieving widespread merchant acceptance comparable to Visa, which is very costly.

176.    On the merchant side of the business, Visa's monopoly power in debit network services reflects its overall dominant positioning as a signature debit network and its large share of signature debit network transactions.  If a merchant does not accept Visa signature debit cards, it is at risk of losing substantial sales to competitor merchants whenever PIN debit is a weak or nonexistent substitute.  Few, if any, merchants are willing to risk the substantial loss of retail sales to rival retailers if they stop accepting Visa signature debit cards.  The loss in retail profits from not accepting Visa signature debit cards makes acceptance a "must have" for a large number of merchants.

177.    On the issuing side of the business, Visa's monopoly power in debit network services also reflects its positioning as a signature debit network.  Because of the differentiation that exists between a PIN and signature debit network, there is a separate demand by issuers to include a signature debit network on debit cards.  Few debit cards are issued without signature authentication and the wider merchant acceptance offered by signature debit networks.  Visa is the dominant supplier of signature debit network services in the U.S. marketplace, a dominance

that reflects, among other things, its history of being the dominant supplier, the fact that it is very costly for an issuer to switch signature debit networks, and its ability to leverage its other businesses and overall position as the largest payments network in the world to obtain debit card placement. Visa's dominant position in the marketplace and switching costs give Visa power that it can exercise against issuers to impose, among other things, the PAVD mandate. This power also is reflected in the higher fees Visa earns on the issuing side of the market from its signature debit product.

178.    Along with its share of transactions, the same barriers to entry, "must have" status, overall market position as the largest payment network in the world, and switching costs that give Visa a monopoly in debit network services also show its monopoly power within the general purpose signature debit card network services market.

## ANTICOMPETITIVE EFFECTS

179.    Visa's new integrated debit strategy is anticompetitive and has no procompetitive justification. It was not undertaken to offer lower prices, better service, or improve product quality, but rather to exclude rivals so as to maintain higher prices and profits from its debit network services business than it otherwise could.

180.    <u>Higher Fees for Issuers and Other Harms to Competition from the PAVD Mandate.</u>  As part of its new integrated debit strategy, Visa has imposed the PAVD mandate on signature debit card issuers. Visa did not attempt to attract issuers to use its PIN functionality by offering lower prices, better service, or improved product quality. It simply mandated by rule that all Visa signature debit issuers must include a Visa PIN option on their debit cards as part of their existing and renewed issuing agreements with Visa. Visa PIN functionality is being forcibly added to Visa signature debit cards regardless of whether the issuer wants it.

181. The net result is competitive harm for several reasons. First, when an issuer does not choose to include Visa's PIN network, Interlink, on a debit card and a PIN-authenticated transaction is routed over Visa's signature debit network based on PAVD, Visa charges an issuer higher network processing fees much like if the transaction were a signature debit transaction. As a result, from an issuer perspective, if a merchant or acquirer routes a PIN transaction over PAVD, the issuer will pay much higher fees because it was coerced into including PAVD as an option than if the PIN transaction had been routed over the other PIN debit networks that the issuer included on the card. Visa therefore is able to extract higher network fees from issuers than it otherwise could. Visa is winning that additional higher priced PAVD business from rivals based not on competition on the merits, but through coercion. This effect also incents financial institutions to include Interlink on their Visa signature debit cards.

182. Second, prior to the PAVD mandate, an issuer could choose to have one PIN debit network included on Visa signature debit cards and it could negotiate such financial arrangements with non-Visa PIN debit networks. The PAVD mandate disrupts that opportunity because issuers no longer can completely control what PIN-authentication options are included on their cards. With the PAVD mandate, every Visa signature debit card will effectively have two or more PIN debit networks enabled on the card – at least one other rival PIN debit network plus Visa through the PAVD mandate. Issuers thus no longer have the ability to choose on the merits to include one PIN debit network based on price and quality. The result is less attractive pricing for issuers and lower volume for non-Visa PIN debit networks.

183. Third, by mandating that its PIN functionality be included on all Visa signature debit cards, Visa is able to set certain network prices (including issuer-side network fees and interchange fees) knowing that it will obtain PIN placement on cards (regardless of whether its

pricing actually warrants it). That knowledge permits Visa to implement strategies to compete for merchant-side routing knowing that if such strategies otherwise would adversely affect its ability to compete for issuers, it will still secure PIN placement on cards regardless of these adverse effects on issuers. Debit networks compete in a two-sided market in which competition on the merits requires pricing to be attractive both on the merchant and issuing sides of the business. The PAVD mandate permits Visa to avoid such competition on the merits and distorts debit network pricing. The net effect is competitive harm to issuers, as Visa can drive overall network pricing without concern about competing for PIN placement on Visa signature cards, resulting in issuers effectively paying higher net prices for network services. Meanwhile, rival PIN debit networks must compete with Visa for merchant and acquirer routing priority, while still (unlike Visa) having to compete for PIN placement on Visa signature debit cards. This handicap due to how the PAVD mandate distorts competition on the merits causes rival PIN debit networks to obtain lower debit network volume that they otherwise would.

184. Fourth, the PAVD mandate exacerbates the anticompetitive effects of the FANF price structure. With the PAVD mandate, a greater share of debit cards will include Visa's PIN functionality and thus be subject to the anticompetitive effects of the FANF price structure. The PAVD mandate will therefore further increase the anticompetitive effects on other PIN debit networks of those Visa initiatives, reducing debit network services competition to the detriment of issuers, merchants, and acquirers.

185. The net effect is higher overall debit network pricing when accumulated across issuers, merchants, and acquirers. Among issuers, while all are affected, the PAVD mandate has a disproportionately greater effect on smaller issuers. Consumers ultimately are paying higher prices and receiving less benefit because of the higher debit network pricing.

186.     There is no procompetitive justification for the PAVD mandate.  If it were more efficient for issuers to include Visa's PIN authentication functionality on all Visa signature debit cards, issuers would have chosen to do so without being coerced and Visa would not have to mandate it.  Issuers had previously shown little interest in Visa's signature debit network PIN-authentication option.  Forcing issuers to adopt a Visa product they have previously rejected is neither procompetitive nor efficient.

187.     Some issuers decided to retain Interlink on their Visa signature debit cards after the Durbin Amendment because they knew Visa was about to implement its PAVD mandate, which would require them to include Visa PIN functionality on the card even if they chose not to include Interlink.  The fact that Interlink was kept on a debit card post-Durbin does not mean a financial institution would have chosen to do so in the absence of the PAVD mandate.  While Interlink has lost placement on some debit cards, Visa has maintained a higher presence of Interlink on debit cards than it otherwise would because of the PAVD mandate.

188.     <u>Higher Total Debit Network Fees for Merchants and Acquirers Due to the Integrated FANF Price Structure.</u>  Visa's new integrated debit strategy includes using a combination of the FANF and lower per-transaction debit network fees to maintain its monopoly.  The effect will be higher debit network fees for merchants and acquirers through the exclusion of rivals.

189.     When Visa originally announced the new fixed network fee, it stated that "we are modifying our economics in a way that we expect will result in a reduction in merchant costs in total and on the margin."  Visa Q3 2011 Earnings Call Transcript, p. 2.  That is not what happened.  As one writer noted, while "Visa originally said in July [2011] the network-participation fee would not represent an overall increase," subsequently "Visa executives seemed

far less eager to make the same declaration." David Heun, "Acquirers Await Details of Visa's New Fee Payments," www.paymentssource.com (February 13, 2012). Indeed, the additional cost of the FANF is far greater than the impact of the lower per-transaction fees as published by Visa. After the announcement of the details of the new FANF price structure, one market analyst commented: "After analyzing the net impact of the change, on the surface, it would seem to indicate that this is a net positive revenue impact for [Visa] as the fixed economics earned seemed to trump any incremental savings the merchant would garner through the reduction of the variable fees." Keefe, Bruyette & Woods Analyst Report (February 22, 2012).

190.    Nor would this analysis change if the rebates in the volume agreements are considered. On information and belief, the FANF is generating an estimated $600-900 million in annual revenues for Visa. The entire Interlink business, pre-Durbin, generated around $300 million in revenues for Visa, including revenues derived from issuers, and Visa has indicated that it is spending less than that on merchant and acquirer rebates.

191.    The aggregate effect of the higher FANF dwarfs any reduction in per-transaction merchant and acquirer debit network fees implemented as part of Visa's new integrated debit strategy. Merchants and acquirers have been adversely affected by Visa's new FANF price structure imposed in response to the Durbin Amendment and regulations.

192.    Although Visa's new FANF pricing structure harms merchants and acquirers, the increase in total network fees creates no economic opportunity for rival debit networks. That is because the FANF is not a per-transaction fee, but a fee charged for having access to Visa's network for credit or debit transactions. No matter what offer another debit network might make, few, if any, merchants will be willing to drop Visa entirely to avoid the FANF. As a result, regardless of any attractive offer of low prices made by a competitor debit network, a

merchant or acquirer cannot avoid the FANF. The FANF price structure therefore is impervious to competition on the merits from rival PIN debit networks and prevents rival networks from competing away the effects of higher network fees imposed on merchants and acquirers.

193. The FANF price structure thus reduces the competitive constraint imposed by rival PIN debit networks on the total cost paid by merchants and acquirers for Visa's debit network services, leading to increased total network fees paid by merchants and acquirers. An equally efficient PIN debit network is not able to prevail in competing with Visa in a way that permits merchants and acquirers to avoid paying higher total network fees. Visa is obtaining debit transaction volume, revenues, and profits that, if the competition were on the merits, it would not. The result is higher market wide debit network fees being paid by merchants and acquirers. Consistent with that, the Federal Reserve shows that aggregate acquirer debit network fees divided by the number of transactions rose from 2011 to 2013. 2011 and 2013 Federal Reserve Reg. II Studies, Table 8. Visa has also stated that its revenues are growing faster than transactions because of new "US debit fees implemented in 2012." Visa Q4 2014 Earnings Call Transcript, p. 4.

194. This exclusion of competition from rival PIN debit networks due to the integrated FANF strategy not only harms merchants and acquirers, but also injures rival debit networks. If another PIN debit network attempts to compete for volume, it faces the problem that Visa has already generated an enormous amount of FANF revenue from merchants and acquirers. A rival PIN debit network must not only compete with Visa's resulting per-transaction price without itself having the FANF revenues, but it also has to compensate any merchant or acquirer that has a Visa volume agreement for failing to meet targets under those agreements. To compete in that

situation means effectively a rival PIN debit network has to agree to provide the funds necessary to pay some of the merchant's FANF to Visa.

195.    When Visa announced the FANF price structure, it noted how the structure permitted it to "invest[] in our secure, reliable and interoperable global payments network" and "generat[e] sufficient revenue to make the investments needed to drive forward."  Visa Q3 2011 Earnings Call Transcript, pp. 2, 4.  Rival networks will not have substantial FANF revenues to similarly recover investments in their networks and therefore can only recover the bulk of such costs through per-transaction fees.  In this situation, an equally efficient network can compete on the merits and still lose volume to Visa.  The net effect is that rival PIN networks are injured, lose share and volume to Visa, and become less competitively relevant, even though Visa has raised total network fees for merchants and acquirers.

196.    Visa's market power gives it the ability to assess a substantial fixed network fee based on credit card and signature debit network usage.  In response to Visa's FANF strategy, other PIN debit networks such as PULSE are attempting to implement fixed fees.  But unlike Visa's fixed fee – which is triggered by acceptance of credit card and signature debit network products over which it has market and monopoly power – the PIN debit networks' fixed fees are fees for acceptance and usage of products for which they have no market power.  Unless PIN networks can offer an attractive overall financial proposition on the merits, merchants can avoid paying the fees.  In a post-Durbin world, where every debit card must be enabled for at least two unaffiliated networks and merchants control routing, there is an increased risk that any network without market power will be dropped by merchants.

197.    The difference between having and not having market and monopoly power is evidenced by the size of the fixed fee.  PULSE's fixed fee currently is 75 cents per month per

merchant location no matter the size. Visa's fixed fee, by contrast, currently ranges from $2 to $85 per month per location depending on the size and type of the merchant (with separate additional fees for "card not present" transactions). Beyond these large differences, a PIN network's fixed fee will generate far less revenue because many more merchants accept signature debit than PIN debit.

198. More generally, competition in which fixed fees are integral and necessary to compete will result in reduced competition. A Federal Reserve economist has discussed that "if it becomes more common for networks to assess fixed fees, merchants may limit their card acceptance to fewer networks. This will play to the advantage of networks currently holding large market shares, because merchants are more likely to accept the cards of networks with large market shares than those with small market shares." Fumiko Hayashi, "The New Debit Card Regulations: Initial Effects on Networks and Banks," at 105 (Federal Reserve Bank of Kansas City 4th Qtr 2012). Smaller PIN debit networks therefore may have trouble obtaining acceptance if they need fixed fees to survive. "Fixed network fees are thus likely to limit competition to only a few large networks." *Id*.

199. There is no procompetitive justification for Visa's new integrated FANF debit strategy. If Visa were simply a more efficient network, it could derive revenues and compete successfully through pricing models that have historically been used in the industry and are still used outside the United States. As the Federal Reserve economist Mr. Hayashi notes, "[p]rior to Visa's recent introduction of its fixed network fee, merchants traditionally were assessed only per-transaction fees to accept payment cards." *Id*. Instead, as an express and direct response to the Durbin Amendment, Visa created a new, unprecedented pricing structure in which it can derive substantial revenues from a price structure that is impervious to competition. That reflects

an anticompetitive intent to evade competition, not a procompetitive attempt to compete on the merits.

200.     There is specifically no pro-competitive efficiency from integrating a fixed fee assessed based on access to one product with lower per-transaction network fees for usage of a separate product.

201.     The fact that the new Visa FANF pricing structure has been implemented at the same time as the Durbin regulations is no coincidence and shows Visa's anticompetitive intent. Visa is seeking to maintain and enhance profits from its debit network monopoly that would otherwise be eroded.  To do so, it is exploiting its immense power within the general purpose credit and charge card and debit card network services markets to retain and increase revenues and profits that otherwise have been lost.

202.     Under its new debit network strategy, Visa will earn higher profits than it otherwise would have, notwithstanding the payments and rebates in the volume agreements. Visa will earn these higher profits at the expense of merchants, acquirers, issuers, and other PIN debit networks.  Consumers ultimately pay higher prices and receive less benefit because of Visa's higher debit network fees.

203.     <u>Higher Debit Network Fees from Blocking PIN Debit Network Competition Against Signature Debit Networks.</u>  Signature debit networks on average charge higher network fees than PIN debit networks.  These higher fees reflect the fact that there is much less competition among signature debit networks.  Today, Visa is the dominant signature debit network and the only other signature debit network with any significant volume is MasterCard. By contrast, while Visa has the largest share, numerous networks compete for PIN authenticated transactions.

204.     PIN debit networks currently are developing products that can compete for the debit network transactions that have historically been predominantly processed by the signature debit networks.   Transactions ripe for additional competition include signature-authenticated transactions, transactions over the Internet and other situations where the card is not physically present, and transactions where no cardholder authentication method is required.   As PIN debit networks are able to compete for such volume, Visa faces the prospect that its signature debit network fees will fall due to the greater competition.

205.     Visa's integrated debit strategy is intended to and will have the effect of shielding its signature debit network from such increased competition.   Most directly, Visa's conduct aims to deny PIN debit network expansion into signature debit through the structure of its volume agreements with merchants, acquirers, and issuers.   By entering into agreements that provide for exclusive or near-exclusive Visa retention of volume historically carried over Visa's signature debit network, Visa denies PIN debit networks the necessary scale needed to induce participation and investment by issuers and acquirers in their new products.   As discussed further below, Visa's conduct also shields its signature debit network business by marginalizing PIN debit networks more generally.

206.     The effect of Visa's conduct will be to impede expansion of PIN debit networks into signature debit, maintaining Visa's monopoly position in both that market and the broader debit network services market.   By impeding further competition, Visa's integrated debit strategy facilitates maintaining higher signature debit network pricing, to the detriment of merchants, acquirers, and issuers.   Consumers ultimately are paying higher prices and receiving fewer benefits because of Visa's conduct.

207.     <u>The Lessened Competitive Constraint Imposed by Marginalized Rival PIN Debit Networks Due to Visa's Illegal Conduct</u>.  The PAVD mandate, Visa's FANF pricing strategy, and Visa's other anticompetitive conduct will also, individually and combined, harm competition through their effects in marginalizing rival PIN debit networks.  Reduced volume and share for rival PIN debit networks will result in less pricing constraint on Visa and increased prices for debit network services.

208.     First, Visa's conduct, by increasing its share of PIN debit transactions and reducing the share of rivals, increases its ability profitably to maintain higher prices for signature debit network services.  Because Visa will recapture a higher percentage of volume lost to PIN debit network services from higher signature debit network prices, Visa can profitably maintain higher signature debit network prices than it otherwise would if its share were lower.

209.     Second, to remain a viable competitive alternative for new business going forward, owners of a PIN debit network must continuously invest in their networks and induce complementary investment by other market participants.  Visa's illegal conduct makes such investment less profitable and less likely.  Lessened investment will degrade the quality of rival debit networks and reduce the competitive constraint that other PIN debit networks can impose on Visa.  Such lessened constraint on Visa results in higher prices for merchants, acquirers, issuers, and consumers.

210.     Third, lower volume and stagnant growth prospects adversely affect the competitive viability of rival PIN debit networks by reducing market presence and relevance.  To attract merchants and issuers, a PIN debit network must have a sufficient level of transactions, acceptance, and cardholders.  As a PIN debit network loses share, it risks losing the network effects that make it attractive to customers and permit it to compete effectively.

211.    Fourth, PIN debit networks historically have been able to compete without owning a credit card and signature card debit network.  Because of Visa's illegal conduct, over time, it will become increasingly difficult for PIN debit networks to compete without an affiliated credit card and signature debit card network.  By making it increasingly difficult to compete absent a presence across multiple products and relevant markets, Visa's conduct imposes a new entry barrier and impairs the competitive constraint that can be imposed on it by smaller, rival PIN debit networks.

212.    Fifth, by maintaining a higher share for its debit network and reducing the share of rival PIN debit networks, Visa enhances significantly its control over how new technologies enter the marketplace.  The result will be lessened competition and higher pricing for new forms of debit network services as the marketplace evolves.  These anticompetitive effects may be enhanced by additional exclusionary conduct specific to how these new technologies are developed and sold in the marketplace.

213.    Finally, the marginalization of rival PIN debit networks, in combination with Visa's other conduct, would have adverse effects in terms of their ability to compete for signature debit business, as discussed above.

## INJURY TO PULSE

214.    PULSE has been and will continue to be injured by Visa's illegal new integrated debit strategy as described herein.

215.     PULSE has been one of the most successful PIN debit networks over the past decade.  Prior to the implementation of Visa's illegal new integrated debit strategy, PULSE's volume and share of PIN debit transactions had grown substantially over the preceding years.  PULSE also has been active in developing new products that pose a significant threat to Visa's

signature debit network position. Visa's conduct is impeding PULSE's ability to succeed with these new products.

216. But-for Visa's illegal conduct, PULSE would have achieved substantial and sustained increases in volume on its network after the Durbin regulations were implemented. Consistent with the opportunities presented by the Durbin regulations and PULSE's past history of success, PULSE initially achieved a substantial increase in volume on its network as the Durbin regulations were being implemented and took effect.

217. Because of Visa's illegal conduct, PULSE now has seen its PIN debit volume drop relative to the initial post-Durbin volume gains. This decline in volume has occurred notwithstanding an overall growth in the number of PIN debit transactions. Visa's implementation of its new illegal strategy and resulting gain in volume coincides with the dramatic decline in PULSE's fortunes.

218. PULSE also is seeing its ability to compete for volume historically carried over signature debit networks impeded by Visa's conduct. PULSE has invested significantly in offering new products to compete against Visa for this business. But PULSE has found it difficult to attract merchant and issuer interest in the face of Visa's illegal conduct. PULSE's lost volume also is reducing the scale and network effects that PULSE would otherwise enjoy, making it less competitive.

219. To maintain its competitive viability, PULSE must continuously invest in its network. As Visa fully implements its new integrated debit strategy and PULSE continues to lose volume due to Visa's illegal conduct, Visa's illegal conduct threatens to make PULSE's continued investment in its debit network no longer economic. Without continued investment,

PULSE's network will be marginalized, lessening the competitive constraint PULSE imposes on Visa.

## CAUSES OF ACTION

## COUNT ONE
**Sherman Act § 2 – Monopolization of the General Purpose Debit Card Network Services Market**

220.    PULSE incorporates and restates the allegations in paragraphs 1 through 219 above.

221.    There is a relevant market for general purpose debit card network services in the United States.

222.    For many years, Visa has possessed monopoly power in this market.

223.    Visa has willfully sought to maintain and enhance this monopoly through exclusionary conduct.  Such exclusionary conduct includes (1) imposing the PAVD mandate on issuers, (2) imposing the FANF pricing structure on merchants and acquirers, (3) entering into merchant and acquirer volume agreements both as part of the FANF price structure and in terms of their effect in impeding rivals from competing for signature debit business, and (4) entering into and enforcing agreements with issuers that impair rival PIN networks' ability to compete for signature debit business.

224.    Each of these exclusionary acts unlawfully maintains and enhances Visa's monopoly on its own terms.  Moreover, the combined effects from these exclusionary acts harm competition by marginalizing rival PIN debit networks and protecting Visa's signature debit network from competition.  As such, these combined effects also illegally maintain Visa's general purpose debit card network services monopoly and constitute an illegal course of conduct that separately violates Sherman Act § 2.

225. Visa's conduct impairs the opportunities of rival PIN debit networks to constrain Visa's pricing in a manner that harms competition and consumers and maintains and enhances its monopoly. Visa's anticompetitive conduct cumulatively will result in higher network fees for merchants, acquirers, and issuers, shield its signature debit business from further competition, and marginalize and otherwise reduce the viability of other PIN debit networks. The result of Visa's anticompetitive conduct has been, and will be, higher prices for merchants, acquirers, issuers, and consumers, higher profits for Visa, and less volume for PULSE and other rival PIN debit networks.

226. There is no procompetitive justification for any of these exclusionary acts. Visa's new integrated debit strategy creates no efficiencies and its introduction to coincide with the new Durbin regulations and new threats to its signature debit business readily evidences its anticompetitive purpose. Visa is not creating a superior product or achieving cost efficiencies. Instead, Visa is using its market power in general purpose credit card network services and monopoly power in general purpose debit card network services to exclude rivals and raise debit network prices, impede entry by rivals into its signature debit business, and prevent the erosion of volumes and profits that otherwise would occur post-Durbin.

227. PULSE has been and will continue to be directly and proximately injured by Visa's exclusionary conduct. PULSE has already seen volume and profits reduced because of Visa's illegal conduct. PULSE's injury constitutes antitrust injury.

**COUNT TWO**
**Sherman Act § 2 – Attempted Monopolization of the General Purpose Debit Card Network Services Market**

228. PULSE incorporates and restates the allegations in paragraphs 1 through 227 above.

229.     There is a relevant market for general purpose debit card network services in the United States.

230.     Visa possesses (at a minimum) substantial market power in this market.

231.     Visa has a dangerous probability of acquiring a general purpose debit card network services monopoly through exclusionary conduct.  Such exclusionary conduct includes (1) imposing the PAVD mandate on issuers, (2) imposing the FANF pricing structure on merchants and acquirers, (3) entering into merchant and acquirer volume agreements both as part of the FANF price structure and in terms of their effect in impeding rivals from competing for signature debit business, and (4) entering into and enforcing agreements with issuers that impair rival PIN networks' ability to compete for signature debit business.

232.     Each of these exclusionary acts has a dangerous probability of success on its own terms.  Moreover, the combined effects from these exclusionary acts harm competition by marginalizing rival PIN debit networks and protecting Visa's signature debit network from competition.  As such, these combined effects have a dangerous probability of success in acquiring monopoly power in the general purpose debit card network services market and constitute an illegal course of conduct that separately violates Sherman Act § 2.

233.     Visa has undertaken this conduct with the specific intent of obtaining monopoly power not by competing on the merits, but rather through conduct designed to exclude rivals and protect its business from competition so as to maintain higher prices and profits from its debit network business than it otherwise could.

234.     Visa's conduct impairs the opportunities of rival PIN debit networks to constrain its pricing in a manner that harms competition and consumers and has a dangerous probability of acquiring monopoly power.  Visa's anticompetitive conduct cumulatively will result in higher

network fees for merchants, acquirers, and issuers, shield its signature debit business from further competition, and marginalize and otherwise reduce the viability of other PIN debit networks. The result of Visa's anticompetitive conduct has been, and will be, higher prices for merchants, acquirers, issuers, and consumers, higher profits for Visa, and less volume for PULSE and other rival PIN debit networks.

235. There is no procompetitive justification for any of these exclusionary acts. Visa's new integrated debit strategy creates no efficiencies and its introduction to coincide with the new Durbin regulations and new threats to its signature debit business readily evidences its anticompetitive purpose. Visa is not creating a superior product or achieving cost efficiencies. Instead, Visa is using its market power in general purpose credit card network services and its (at a minimum) substantial market power in general purpose debit card network services to exclude rivals and raise debit network prices, impede entry by rivals into its signature debit business, and prevent the erosion of volumes and profits that otherwise would occur post-Durbin.

236. PULSE has been and will continue to be directly and proximately injured by Visa's exclusionary conduct. PULSE has already seen volume and profits reduced because of Visa's illegal conduct. PULSE's injury constitutes antitrust injury.

## COUNT THREE
### Sherman Act § 2 – Monopolization of the General Purpose Signature Debit Card Network Services Market

237. PULSE incorporates and restates the allegations in paragraphs 1 through 236 above.

238. There is a relevant market for general purpose signature debit card network services in the United States.

239. For many years, Visa has possessed monopoly power in this market.

240. Visa has willfully sought to maintain and enhance this monopoly through exclusionary conduct. Such exclusionary conduct includes (1) imposing the PAVD mandate on issuers, (2) imposing the FANF pricing structure on merchants and acquirers, (3) entering into merchant and acquirer volume agreements both as part of the FANF price structure and in terms of their effect in impeding rivals from competing for signature debit business, and (4) entering into and enforcing agreements with issuers that impair rival PIN networks' ability to compete for signature debit business.

241. Each of these exclusionary acts unlawfully maintains and enhances Visa's monopoly on its own terms. Moreover, the combined effects from these exclusionary acts harm competition by marginalizing rival PIN debit networks and protecting Visa's signature debit network from competition. As such, these combined effects also illegally maintain Visa's general purpose signature debit card network services monopoly and constitute an illegal course of conduct that separately violates Sherman Act § 2.

242. Visa's conduct impairs the opportunities of rival PIN debit networks to constrain its pricing in a manner that harms competition and consumers and maintains and enhances its monopoly. Visa's anticompetitive conduct cumulatively will result in higher signature debit network fees for merchants, acquirers, and issuers, shield its signature debit business from further competition, and marginalize and otherwise reduce the viability of other PIN debit networks. The result of Visa's anticompetitive conduct has been, and will be, higher prices for merchants, acquirers, issuers, and consumers, higher profits for Visa, and less volume for PULSE and other rival PIN debit networks.

243. There is no procompetitive justification for any of these exclusionary acts. Visa's new integrated debit strategy creates no efficiencies and its introduction to coincide with the new

Durbin regulations and new threats to its signature debit business readily evidences its anticompetitive purpose. Visa is not creating a superior product or achieving cost efficiencies. Instead, Visa is using its market power in general purpose credit card network services and monopoly power in general purpose signature debit card network services to exclude rivals and raise signature debit network prices, impede entry by rivals into its signature debit business, and prevent the erosion of volumes and profits that otherwise would occur post-Durbin.

244. PULSE has been and will continue to be directly and proximately injured by Visa's exclusionary conduct. PULSE has already seen volume and profits reduced because of Visa's illegal conduct. PULSE's injury constitutes antitrust injury.

## COUNT FOUR
**Sherman Act § 2 – Attempted Monopolization of the General Purpose Signature Debit Card Network Services Market**

245. PULSE incorporates and restates the allegations in paragraphs 1 through 244 above.

246. There is a relevant market for general purpose signature debit card network services in the United States.

247. Visa possesses (at a minimum) substantial market power in this market.

248. Visa has a dangerous probability of acquiring a general purpose signature debit card network services monopoly through exclusionary conduct. Such exclusionary conduct includes (1) imposing the PAVD mandate on issuers, (2) imposing the FANF pricing structure on merchants and acquirers, (3) entering into merchant and acquirer volume agreements both as part of the FANF price structure and in terms of their effect in impeding rivals from competing for signature debit business, and (4) entering into and enforcing agreements with issuers that impair rival PIN networks' ability to compete for signature debit business.

249. Each of these exclusionary acts has a dangerous probability of success on its own terms. Moreover, the combined effects from these exclusionary acts harm competition by marginalizing rival PIN debit networks and protecting Visa's signature debit network from competition. As such, these combined effects have a dangerous probability of success in acquiring monopoly power in the general purpose signature debit card network services market and constitute an illegal course of conduct that separately violates Sherman Act § 2.

250. Visa has undertaken this conduct with the specific intent of obtaining monopoly power not by competing on the merits, but rather through conduct designed to exclude rivals and protect its business from competition so as to maintain higher prices and profits from its signature debit network services business than it otherwise could.

251. Visa's conduct impairs the opportunities of rival PIN debit networks to constrain its pricing in a manner that harms competition and consumers and has a dangerous probability of acquiring monopoly power. Visa's anticompetitive conduct cumulatively will result in higher network fees for merchants, acquirers, and issuers, shield its signature debit business from further competition, and marginalize and otherwise reduce the viability of other PIN debit networks. The result of Visa's anticompetitive conduct has been, and will be, higher prices for merchants, acquirers, issuers, and consumers, higher profits for Visa, and less volume for PULSE and other rival PIN debit networks.

252. There is no procompetitive justification for any of these exclusionary acts. Visa's new integrated debit strategy creates no efficiencies and its introduction to coincide with the new Durbin regulations and new threats to its signature debit business readily evidences its anticompetitive purpose. Visa is not creating a superior product or achieving cost efficiencies. Instead, Visa is using its market power in credit card network services and its (at a minimum)

substantial market power in general purpose signature debit card network services to exclude rivals and raise debit network prices, impede entry by rivals into its signature debit business, and prevent the erosion of volumes and profits that otherwise would occur post-Durbin.

253. PULSE has been and will continue to be directly and proximately injured by Visa's exclusionary conduct. PULSE has already seen volume and profits reduced because of Visa's illegal conduct. PULSE's injury constitutes antitrust injury.

## COUNT FIVE
**Sherman Act § 1 – Agreements Imposing FANF Structure in Restraint of Trade**

254. PULSE incorporates and restates the allegations in paragraphs 1 through 253 above.

255. There is a relevant market for general purpose debit card network services in the United States.

256. For many years, Visa has on the merchant side of the market possessed substantial market power in the general purpose credit and charge card network services market and (at a minimum) substantial market power in the general purpose debit card network services market.

257. Visa has entered into agreements with acquirers in which Visa allows merchants serviced by the acquirers to accept Visa's credit and debit cards under terms and conditions that Visa imposes.

258. Visa has conditioned its acceptance agreements on acquiescence to its new integrated FANF price structure imposed in response to the Durbin Amendment and regulations. No merchant or acquirer that wants to accept Visa credit or debit cards has the ability to opt out of paying the FANF and being subject to this new integrated FANF price structure. Because of Visa's power as a general purpose credit card network and debit card network services provider, the vast majority of merchants have little choice but to accept Visa credit and debit cards and

few, if any, merchants have dropped acceptance of Visa credit and debit cards in response to the FANF. This new FANF price structure is being imposed over the objections of merchants and acquirers. Merchants and acquirers are worse off because of the effects of this newly imposed FANF price structure.

259. By requiring merchants and acquirers to agree to the FANF price structure as a condition of acceptance, Visa has imposed an economic structure that causes merchants and acquirers to process more debit transactions over Visa's debit networks than they otherwise would.

260. Visa's agreements imposing the FANF price structure foreclose opportunities for rival PIN debit networks in a manner that harms competition in the general purpose debit card network services market. The result of Visa's anticompetitive conduct has been, and will be, higher prices for merchants, acquirers, issuers, and consumers, higher profits for Visa, and less volume for PULSE and other rival PIN debit networks. As such, the agreements are in restraint of trade under Sherman Act § 1.

261. There is no procompetitive justification for these agreements. Visa's new FANF price structure creates no efficiencies and its introduction to coincide with the new Durbin regulations and new threats to its signature debit business readily evidences its anticompetitive purpose. Visa is not creating a superior product or achieving cost efficiencies. Instead, Visa is using its substantial market power in general purpose credit card network services and general purpose debit card network services to exclude rivals and raise debit network prices, impede entry by rivals into its signature debit business, and prevent the erosion of volumes and profits that otherwise would occur post-Durbin.

262.     Visa's agreements have already, and continue to, directly and proximately injure PULSE.  PULSE has already seen volume and profits reduced because of Visa's agreements.  PULSE's injury constitutes antitrust injury.

## COUNT SIX
### Sherman Act § 1 – Exclusive Dealing
### (Merchant and Acquirer Volume Agreements)

263.     PULSE incorporates and restates the allegations in paragraphs 1 through 262 above.

264.     There is a relevant market for general purpose debit card network services in the United States.  Within that market, there is a relevant market for general purpose signature debit card network services.

265.     For many years, Visa has on the merchant side of the market possessed (at a minimum) substantial market power in the markets for general purpose debit card network services and signature debit card network services in the United States.

266.     Visa has announced a new integrated debit strategy that encompasses entering into volume agreements with merchants and acquirers.  These volume agreements offer financial consideration in exchange for merchants and acquirers meeting volume (or share) targets.

267.     The volume agreements substantially foreclose the ability of PIN debit networks to compete for the types of debit volume historically processed by signature debit networks.  Visa processes about 70-80% of all signature debit network transactions and, on information and belief, the volume agreements effectively target a substantial percentage of that volume.

268.     The volume agreements harm competition in both the general purpose debit card network services and signature debit card network services markets.  PIN debit networks not owned by Visa and MasterCard have historically been the primary actual and potential constraint on Visa's power in the general purpose debit card and signature debit card network services

markets. In particular, PIN debit networks currently pose a nascent threat to Visa's dominant signature debit business by offering new products to compete for that business. Absent the ability to attract sufficient volume to achieve the scale necessary to make economic both the investment by the network and the complementary investment by acquirers, merchants, and issuers necessary to facilitate entry and expansion, new competition for the signature debit volume historically dominated by Visa will be weakened or precluded. By denying rival PIN debit networks the ability to attract a critical mass of volume needed to compete, the volume agreements foreclose and impede new competition for Visa's signature debit business. The result has been, and will be, higher prices for merchants, acquirers, issuers, and consumers, higher profits for Visa, and less volume for PULSE and other rival PIN debit networks.

269. There are no procompetitive efficiencies from Visa's conduct. The timing of the volume agreements to coincide with new threats to its signature debit business readily evidences its anticompetitive purpose.

270. PULSE has been and will continue to be directly and proximately injured by the foreclosing effects of Visa's volume agreements. PULSE is one of the PIN debit networks best positioned to compete for volume historically carried over signature debit networks. By entering into agreements with merchants and acquirers premised on excluding other PIN debit networks, Visa not only harms competition but also harms PULSE directly. PULSE's injury constitutes antitrust injury.

## COUNT SEVEN
## Sherman Act § 1 – PAVD Tying

271. PULSE incorporates and restates the allegations in paragraphs 1 through 270 above.

272.     Within the relevant market for general purpose debit card network services in the United States, the provision of network services for signature debit network transactions and PIN-authenticated debit transactions constitute separate products.

273.     There is a separate and distinct competition among signature debit networks for inclusion of their network on an issuer's debit cards.  For many years, Visa has on the issuing side of the market possessed (at a minimum) substantial market power with respect to its signature debit network product.  Today, Visa dominates in terms of inclusion of signature functionality on debit cards, processing at a network level approximately 70-80% of all signature debit network transactions.  This market power with respect to its significant debit network product is sufficient to force issuers to comply with the PAVD mandate over their objections.

274.     Under the PAVD mandate and its agreements with signature debit network issuers, Visa is conditioning its provision of signature debit network services to issuers (the "tying product") on those issuers also including Visa PIN-authentication debit network services on Visa signature debit cards (the "tied product").  Visa mandates that an issuer must offer Visa's PIN authentication functionality if it wishes to use Visa's signature debit network services.  To comply, an issuer must either include Visa's PIN debit network, Interlink, on Visa signature debit cards or enable PAVD on those cards.  This tying arrangement is coercive, involuntary, and is being mandated and imposed over issuers' objections.

275.     The PAVD mandate already is affecting a substantial amount of commerce, causing large numbers of PIN debit transactions to be routed over Visa that otherwise would not be.  Rather than compete for PIN placement on debit cards, Visa has been able to obtain this additional PIN debit volume through coercion.

276.    Visa's tying arrangement harms competition and has anticompetitive effects both within the broader general purpose debit card network services market and within the general purpose PIN debit card network services submarket.    Within the general purpose debit card network services market, the tying arrangement is occurring between two differentiated products competing within the market.    The effect of the tying arrangement is that issuers are paying higher prices for processing PIN-authenticated debit transactions.    By foreclosing rival PIN debit networks and reducing their share of PIN-authenticated debit transactions, the tying arrangement also marginalizes these networks more generally, resulting in less pricing constraint on Visa and increased prices for debit network services for merchants, acquirers, and issuers.

277.    Within the general purpose PIN debit card network services submarket, the competition for placement on debit cards among PIN debit networks has similarly been harmed. Issuers are paying higher prices for processing of PIN-authenticated debit transactions because of Visa's illegal tying arrangement.    By foreclosing rival PIN debit networks and reducing their share of PIN-authenticated debit transactions, the tying arrangement also marginalizes these networks, resulting in less competition within the submarket, and also increased prices for debit network services more generally for merchants, acquirers, and issuers.

278.    PULSE has been and will continue to be directly and proximately injured by the PAVD mandate.    By imposing the PAVD mandate, Visa not only harms customers and diminishes competition, it also harms PULSE by restricting its ability to obtain placement on cards, impairing its ability to compete for PIN debit transactions, and reducing the scale it needs to compete effectively for signature debit business.    PULSE already has seen volume and profits reduced because of the foreclosing effect of the PAVD mandate.    PULSE's injury due to Visa's PAVD tying arrangement constitutes antitrust injury.

**COUNT EIGHT**
**Sherman Act § 1 – Agreements Imposing PAVD Mandate in Restraint of Trade**

279.    PULSE incorporates and restates the allegations in paragraphs 1 through 278 above.

280.    There is a relevant market for general purpose debit card network services in the United States.

281.    There is a separate and distinct competition among signature debit networks for inclusion of their network on an issuer's debit cards.  For many years, Visa has on the issuing side of the market possessed (at a minimum) substantial market power with respect to its signature debit network product.  Today, Visa dominates in terms of inclusion of signature functionality on debit cards, processing at a network level approximately 70-80% of all signature debit network transactions.  This market power with respect to its significant debit network product is sufficient to force issuers to comply with the PAVD mandate over their objections.

282.    Under the PAVD mandate and its agreements with signature debit network issuers, Visa is conditioning its provision of signature debit network services to issuers on those issuers also including Visa PIN authentication functionality on Visa signature debit cards.  Visa mandates that an issuer must offer Visa's PIN authentication functionality if it wishes to use Visa's signature debit network services.  To comply, an issuer must either include Visa's PIN debit network, Interlink, on Visa signature debit cards or enable PAVD on those cards.  This restraint of trade is coercive, involuntary, and is being mandated and imposed over issuers' objections.

283.    The PAVD mandate already is affecting a substantial amount of commerce, causing large numbers of PIN debit transactions to be routed over Visa that otherwise would not

be. Rather than compete for PIN placement on debit cards, Visa has been able to obtain this additional PIN debit volume through coercion.

284. The PAVD mandate harms competition and has anticompetitive effects within the general purpose debit card network services market. The effect of the PAVD mandate is that issuers are paying higher prices for processing PIN-authenticated debit transactions. By foreclosing rival PIN debit networks and reducing their share of PIN-authenticated debit transactions, the PAVD mandate also marginalizes these networks more generally, resulting in less pricing constraint on Visa and increased prices for debit network services for merchants, acquirers, and issuers.

285. There is no procompetitive justification for the PAVD mandate. If PIN functionality on its signature debit network allowed Visa to offer a superior product or obtain cost efficiencies, Visa should be able to better compete by marketing this superior product or lowering its fees because its costs are lower. In short, Visa would not need to impose a coercive mandate on its issuers. In reality, the PAVD functionality has existed on Visa's signature debit network for several years without achieving commercial success in the marketplace. Visa is imposing the PAVD mandate on issuers because there is no marketplace demand for the product, and it can only obtain the desired foreclosure of PIN debit network rivals through a mandatory requirement.

286. The timing of the PAVD mandate evinces Visa's anticompetitive intent and lack of procompetitive justification. Visa is imposing the PAVD mandate as a response to the Durbin regulations and the resulting threat to its debit network business.

287. PULSE has been and will continue to be directly and proximately injured by the PAVD mandate. By imposing the PAVD mandate, Visa not only harms customers and

diminishes competition, it also harms PULSE by restricting its ability to obtain placement on cards, impairing its ability to compete for PIN debit transactions, and reducing the scale it needs to compete effectively for signature debit business. PULSE already has seen volume and profits reduced because of the foreclosing effect of the PAVD mandate. PULSE's injury due to the PAVD mandate constitutes antitrust injury.

**COUNT NINE**
**Texas Free Enterprise and Antitrust Act**

288. PULSE incorporates and restates the allegations in paragraphs 1 through 287 above.

289. Counts 1-8 as alleged above also state claims under the Texas Free Enterprise and Antitrust Act.

**COUNT TEN**
**Tortious Interference With Prospective Business Relationships**

290. PULSE incorporates and restates the allegations in paragraphs 1 through 289 above.

291. Following the implementation of the Durbin regulations, PULSE entered into a number of agreements with issuing financial institutions to ensure the placement of PULSE's PIN debit network on the issuers' debit cards. As a result of these arrangements, PULSE realized an increase in volume on its network. But for Visa's new integrated debit strategy, PULSE had a reasonable probability of entering into similar arrangements with other financial institutions.

292. Following the implementation of the Durbin regulations, PULSE has competed for and successfully obtained arrangements with merchants and acquirers in which PULSE has obtained routing priority for PIN debit transactions. As a result of these arrangements, PULSE realized an increase in volume on its network. But for Visa's new integrated debit strategy,

PULSE had a reasonable probability of entering into similar arrangements with other merchants and acquirers.

293. PULSE has invested in and successfully developed new products to compete for debit transactions that have been historically processed by signature debit networks. While nascent, some of these products have begun to have some commercial success. Visa, however, has taken steps to interfere with PULSE's ability to develop sufficient issuer, merchant, and acquiring relationships so as to achieve the critical mass and network effects necessary to make these new products a more robust threat to its signature debit business. But for Visa's new integrated debit strategy, PULSE had a reasonable probability of entering into additional business relationships with issuers, merchants, and acquirers that would be leading to greater success for these products.

294. Visa was aware of PULSE's prospects for entering into additional agreements with issuing financial institutions, PULSE's success in competing for routing priority from merchants and acquirers, and PULSE's development of new products that would compete against its signature debit business. Visa was aware that PULSE had a reasonable probability of success in entering into new business arrangements if it competed against Visa on the merits.

295. Visa intentionally sought to prevent PULSE from entering into all of these new business arrangements by engaging in unlawful conduct. This conduct includes (1) imposing the PAVD mandate on issuers, (2) imposing the FANF pricing structure on merchants and acquirers, (3) entering into merchant and acquirer volume agreements both as part of the FANF price structure and in terms of their effect in impeding rivals from competing for signature debit business, and (4) entering into and enforcing agreements with issuers that impair rival PIN networks' ability to compete for signature debit business.

296. Visa engaged in this unlawful conduct with a conscious desire to prevent, and with knowledge that its conduct was certain or substantially certain to prevent, PULSE's continued success in entering into business relationships that PULSE otherwise had a reasonable probability of entering into.

297. Visa's unlawful conduct has directly caused PULSE actual injury and damages.

298. With respect to all the counts, all conditions precedent to the relief sought herein have been performed or have occurred.

## DEMAND FOR JURY

299. PULSE demands a trial by jury on all triable issues of fact.

## RELIEF REQUESTED

WHEREFORE, premises considered, PULSE respectfully requests the following relief: (a) injunctive relief sufficient to enjoin the FANF price structure, the PAVD mandate, the illegal volume agreements, and all other related aspects of Visa's illegal conduct, along with all other relief necessary to restore lost competition in the debit network and signature debit network marketplaces, including any restructuring of Visa necessary to restore lost competition, 15 U.S.C. § 26; (b) an award to PULSE of actual damages in an amount to be determined at trial, trebled pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15 and Tex. Bus. & Com. Code Ann. § 15.21, along with interest on such damages; (c) an award to PULSE of its costs, including reasonable attorney's fees, as provided in, but not limited to, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26 and Tex. Bus. & Com. Code Ann. § 15.21(a)(1); (d) an award of exemplary damages; and (e) such further relief as the Court may deem just and equitable.

Respectfully submitted,

**BECK ǀ REDDEN L.L.P.**


By:     */s/ David J. Beck*
                  David J. Beck
                  Texas State Bar No. 00000070
                  Federal I.D. No. 16605
         1221 McKinney, Suite 4500
         Houston, Texas 77010-2010
         Telephone: (713) 951-3700
         Facsimile: (713) 951-3720

         **ATTORNEY-IN-CHARGE FOR**
         **PLAINTIFF PULSE NETWORK LLC**


**BECK ǀ REDDEN L.L.P.**
Geoff A. Gannaway
Texas State Bar No. 24036617
Federal I.D. No. 37039
1221 McKinney, Suite 4500
Houston, Texas 77010-2010
Telephone: (713) 951-3700
Facsimile: (713) 951-3720

**KIRKLAND & ELLIS LLP**
William Pratt P.C. (*pro hac vice* forthcoming)
Jennifer M. Selendy (*pro hac vice* forthcoming)
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

**KIRKLAND & ELLIS LLP**
Michael S. Becker (*pro hac vice* forthcoming)
655 15th Street, N.W.
Suite 1200
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

**OF COUNSEL FOR**
**PLAINTIFF PULSE NETWORK LLC**